**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| AMERICAN FARM BUREAU FEDERATION, AMERICAN PETROLEUM INSTITUTE, AMERICAN ROAD AND TRANSPORTATION BUILDERS ASSOCIATION, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, LEADING BUILDERS OF AMERICA, MATAGORDA COUNTY FARM BUREAU, NATIONAL ASSOCIATION OF HOME BUILDERS, NATIONAL ASSOCIATION OF REALTORS®, NATIONAL CATTLEMEN'S BEEF ASSOCIATION, NATIONAL CORN GROWERS ASSOCIATION, NATIONAL MINING ASSOCIATION, NATIONAL MULTIFAMILY HOUSING COUNCIL, NATIONAL PORK PRODUCERS COUNCIL, NATIONAL STONE, SAND AND GRAVEL ASSOCIATION, PUBLIC LANDS COUNCIL, TEXAS FARM BUREAU, and U.S. POULTRY AND EGG ASSOCIATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in his official capacity as ADMINISTRATOR OF U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as CHIEF OF ENGINEERS AND COMMANDING GENERAL, U.S. ARMY CORPS OF ENGINEERS; and MICHAEL L. CONNOR, in his official capacity as ASSISTANT SECRETARY OF THE ARMY (CIVIL WORKS) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 3:23-cv-20

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs AMERICAN FARM BUREAU FEDERATION, AMERICAN PETROLEUM INSTITUTE, AMERICAN ROAD AND TRANSPORTATION BUILDERS ASSOCIATION, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, LEADING BUILDERS OF AMERICA, MATAGORDA COUNTY FARM  BUREAU, NATIONAL ASSOCIATION OF HOME BUILDERS, NATIONAL ASSOCIATION OF REALTORS®, NATIONAL CATTLEMEN'S BEEF ASSOCIATION, NATIONAL CORN GROWERS ASSOCIATION, NATIONAL MINING ASSOCIATION, NATIONAL MULTIFAMILY HOUSING COUNCIL, NATIONAL PORK PRODUCERS COUNCIL, NATIONAL STONE, SAND AND GRAVEL ASSOCIATION, PUBLIC LANDS COUNCIL, TEXAS FARM BUREAU, and U.S. POULTRY AND EGG ASSOCIATION (collectively, the "Plaintiffs"), for their Complaint against Defendants U.S. ENVIRONMENTAL PROTECTION AGENCY ("EPA"); MICHAEL S. REGAN, in his official capacity as ADMINISTRATOR OF U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ARMY CORPS OF ENGINEERS ("Corps"); LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as CHIEF OF ENGINEERS AND COMMANDING GENERAL, U.S. ARMY CORPS OF ENGINEERS; and MICHAEL L. CONNOR, in his official capacity as ASSISTANT SECRETARY OF THE ARMY (CIVIL WORKS) (collectively, the "Defendants"),[1] allege, by and through their attorneys of record, on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

**INTRODUCTION**

1.     This is a lawsuit for declaratory judgment and injunctive relief challenging the legality of the final administrative rule titled "Revised Definition of 'Waters of the United

---

[1] The U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers are collectively referred to as the "Agencies."

States'" (the "Rule"), promulgated by the Defendants. The Rule was signed by Administrator Regan on December 29, 2022, and by Assistant Secretary Connor on December 28, 2022, and was published in the Federal Register at 88 Fed. Reg. 3004 on January 18, 2023.

2.      With limited exceptions, the Clean Water Act ("CWA") prohibits "discharg[ing] . . . any pollutant" without a permit issued under Section 402 of the CWA for discharges covered by the National Pollution Discharge Elimination System ("NPDES") or a Section 404 permit allowing discharges of dredged or fill material. 33 U.S.C. § 1311(a). The CWA defines the term "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source." *Id*. § 1362(12)(A). "Navigable waters," in turn, are defined to mean "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

3.      The Rule challenged here purports to "clarify" the Agencies' definition of "waters of the United States" ("WOTUS") within the meaning of 33 U.S.C. § 1362(7) (88 Fed. Reg. at 3139), which demarcates the geographic reach of not only the CWA's two permitting schemes, but also of "the entire statute." *Rapanos v. United States*, 547 U.S. 715, 742 (2006) (plurality).

4.      Instead of providing much-needed clarity to the regulated community, however, all the Rule makes clear is that the Agencies are determined to exert CWA jurisdiction over a staggering range of dry land and water features—whether large or small; permanent, intermittent, or ephemeral; flowing or stagnant; natural or manmade; interstate or intrastate; and no matter how remote from or lacking in a physical connection to actual navigable waters. Under the Rule, Plaintiffs' members will constantly be at risk that any sometimes-wet feature on their property will be deemed WOTUS by the Agencies using vague and unpredictable standards—making normal business activities in that area subject to criminal and civil penalties.

5.    The Rule should be held unlawful under the Administrative Procedure Act, ("APA"), 5 U.S.C. §§ 551-706, because the Rule adopts an unworkable definition of WOTUS that conflicts with the CWA, the Constitution, and Supreme Court precedent. Among its many defects, the Rule:

- effectively reads the term "navigable waters" out of the CWA, contrary to *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001) ("*SWANCC*"), replacing it with a "significantly affect" standard that has no basis in the CWA;

- asserts improperly vague and malleable jurisdiction over features that "alone or in combination with similarly situated waters in the region" "significantly affect" navigable waters, interstate waters, or tributaries, determined by multiple indeterminate factors that provide no practical guidance to the regulated community, 88 Fed. Reg. at 3006;

- asserts improperly vague and malleable jurisdiction over wetlands that are "neighboring" other nebulously defined features, 88 Fed. Reg. at 3143;

- improperly "alters the federal-state framework by permitting federal encroachment upon [the] traditional state power" over land and water (*SWANCC*, 531 U.S. at 173), which Congress expressly protected, *see* 33 U.S.C. § 1251(b) (it is "the policy of Congress" "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] plan the development and use . . . of land and water resources");

- exceeds the Agencies' delegated authority under the Commerce Clause, *SWANCC*, 513 U.S. at 172; and

3

- as a result of its vagueness and expansive reach, violates due process, the rule of lenity applied to statutes creating criminal penalties (*see*, *e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016)), the "major questions" doctrine (*see*, *e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–2608 (2022)), and the nondelegation doctrine (*see*, *e.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

6.      The Rule imposes impossible—and unpredictable—burdens on land owners, users, and purchasers. It requires them to assess not only their own land, but also vast expanses of land beyond their own holdings, using multiple vaguely defined connections to potentially remote features, in an effort to determine if their land is regulated under the CWA. Those burdens result from the Agencies' predicating jurisdiction over enormous swaths of the country on their misreading of a single concurring opinion in *Rapanos* that articulated a view rejected by the other eight justices. The consequence is a sweeping and unwieldy regulation that leaves the identification of jurisdictional waters so opaque, uncertain, and all-encompassing that Plaintiffs and their members and clients cannot determine whether and when the most basic activities undertaken on land will subject them to drastic criminal and civil penalties; and that strips the States of their primary authority and traditional powers over land and waters that Congress intended them to retain.

7.      In promulgating the Rule, the Agencies conducted a flawed cost-benefit analysis that dramatically underestimated costs imposed by the Rule, omitted relevant costs from the analysis, and overestimated benefits of the Rule. The Agencies failed meaningfully to consider the direct costs the Rule imposes on small businesses. And the Agencies disregarded their duty to solicit or consider flexible regulatory proposals under the Regulatory Flexibility Act.

8.      This action arises under, and alleges violations of, the APA. In particular, the Defendants' actions in promulgating the Rule were "arbitrary, capricious, an abuse of discretion," and "otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C); "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D); and beyond the Agencies' authority under the "major questions" doctrine, *see W. Virginia*, 142 S. Ct. at 2608-2609; *Nat'l Fed'n of Indep. Bus.* v. *Dep't of Labor,* 142 S. Ct. 661 (2022) ("*NFIB*").

9.      Plaintiffs seek a declaration from the Court that the Rule violates the APA, contravenes the plain text of the CWA, and violates the United States Constitution, including but not limited to the Commerce Clause of Article I, Section 8 and the Due Process Clause of the Fifth Amendment. Plaintiffs further seek an order vacating the Rule and enjoining its implementation or application.

10.      Alternatively, unless the definition in 33 U.S.C. § 1362(7) is interpreted to provide clear guidance to the Agencies in implementing the CWA—as the plurality of the Supreme Court interpreted it in *Rapanos*, 547 U.S. at 731-39 (plurality op. of Scalia, J.), and as the Agencies interpreted it in their 2020 Navigable Waters Protection Rule[2]—Section 1362(7) fails to state an intelligible principle constraining agency action. It therefore violates Article I, section 1 of the Constitution and the nondelegation doctrine. *See, e.g., A.L.A. Schechter Poultry*, *supra*; *Gundy v. United States*, 139 S. Ct. 2116, 2140 (2019) (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *id.* at 2031 (Alito, J., concurring); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J. respecting the denial of certiorari). Thus, if the

---

[2] The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020) ("NWPR" or "2020 Rule").

Court concludes Section 1362(7) is so standardless as to permit the Rule, the Rule should be declared invalid and vacated because the statutory provision it interprets is unconstitutional.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331. It has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202; 5 U.S.C. §§ 705, 706(1), 706(2)(A)(B)(C) & (D); and its general equitable powers.

12.     The APA provides a cause of action for parties adversely affected by final agency action when "there is no other adequate remedy in a court." 5 U.S.C. § 704. That condition is met in this case because the Rule is a final agency action and plaintiffs have no other adequate remedy available in any other court.

13.     This Court has subject matter jurisdiction to review the Rule because this challenge to the Rule is not one of the actions that Section 509(b) of the CWA, 33 U.S.C. § 1369(b)(1) deems to fall within the exclusive jurisdiction of the courts of appeals. *See Nat'l Ass'n. of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 623 (2018).

14.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(B) because the Defendants are officers or agencies of the United States and because WOTUS jurisdictional determinations under the Rule will be made in the district; and it is proper under 28 U.S.C. § 1391(e)(1)(C) because one or more Plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

## THE PARTIES

### A. Plaintiffs[3]

15. Plaintiff **American Farm Bureau Federation** ("AFBF") is a voluntary general farm organization formed in 1919 to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. It is headquartered in the District of Columbia. Through its state and county Farm Bureau organizations, AFBF represents about 6 million member families in all 50 states and Puerto Rico, including thousands of member families in Texas, including members who are directly and adversely impacted by the Rule. AFBF submitted comments on the Proposed Rule[4] on February 7, 2022.[5] It also joined the comments of the Waters Advocacy Coalition ("WAC"), of which AFBF is a member, submitted on behalf of a coalition of industry groups. WAC submitted its comments on the Proposed Rule on February 7, 2022, and corrective comments on February 9, 2022.[6]

16. Plaintiff **American Petroleum Institute** ("API") is a national trade organization of nearly 600 members, including ones in Texas, involved in all aspects of the domestic and international oil and natural gas industry, including exploration, production, refining, marketing, distribution, and marine activities. API's members include producers, refiners, suppliers, pipeline operators, and marine transporters, as well as service and supply companies that support all segments of the industry. API and its members are dedicated to meeting environmental requirements while economically developing and supplying energy resources for consumers. API's members, including ones in Texas, are directly and adversely impacted by the Rule. API,

---

[3] Declarations of Plaintiffs and their members in support of this action are attached as Exhibit A.

[4] Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021) ("Proposed Rule").

[5] *Comments of the American Farm Bureau Federation on the Revised Definition of "Waters of the United States" 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[6] *Comments of the Waters Advocacy Coalition (WAC) on the U.S. Environmental Protection Agency's and U.S. Army Corps of Engineers' Proposed Revised Definition of "Waters of the United States,"* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022) (corrected Feb. 9, 2022).

along with the American Exploration and Production Council and the Independent Petroleum Association of America, submitted joint comments on the Proposed Rule on February 7, 2022.[7] API also joined WAC's comments.

17.      The **American Road and Transportation Builders Association's** ("ARTBA") membership includes private and public sector members, including ones in Texas, that are involved in the planning, designing, construction and maintenance of the nation's roadways, waterways, bridges, ports, airports, rail and transit systems. ARTBA's more than 6,000 members generate more than $380 billion annually in U.S. economic activity, sustaining more than 3.3 million American jobs. ARTBA members are directly involved with the federal wetlands permitting program and undertake a variety of construction-related activities that require compliance with the CWA. As part of the transportation construction process, ARTBA members are actively involved in the restoration and preservation of wetlands. Since the CWA's passage, ARTBA has actively worked to achieve the complementary goals of improving our nation's transportation infrastructure and protecting essential water resources. ARTBA's members, including ones in Texas, are directly and adversely impacted by the Rule. ARTBA submitted comments on the Proposed Rule on February 7, 2022.[8] ARTBA also joined WAC's comments on the Proposed Rule.

18.      Plaintiff **Associated General Contractors of America** ("AGC") is a national construction trade association with more than 27,000 member firms representing construction contractor firms, suppliers and service providers across the nation.  AGC members are involved

---

[7] *Comments of the American Petroleum Institute, the American Exploration and Production Council, and the Independent Petroleum Association of America regarding The Associations' Response to the Environmental Protection Agency's and Army Corps of Engineers' Proposed Rule to Revise the Definition of "Waters of the United States;" 86 Fed. Reg. 69,372 (Dec. 7, 2021)/EPA-HQ-OW-2021-0602)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[8] *Comments of the American Road and Transportation Builders Association on Docket No. EPA-HQ-OW-2021-0602; Revised Definition of "Waters of the United States,"* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

in all aspects of nonresidential construction, including construction of the nation's public and private buildings, shopping centers, factories, warehouses, highways, bridges, tunnels, airports, water works facilities and multi-family housing units. AGC's members, including in Texas, are directly and adversely impacted by the Rule. AGC submitted comments on the Proposed Rule on February 7, 2022.[9] AGC also joined WAC's comments on the Proposed Rule.

19.     Plaintiff **Leading Builders of America** ("LBA") is a national trade association representing 21 of the largest homebuilding companies in North America. Collectively LBA members build approximately 35% of all new homes in America. Its purpose is to preserve home affordability for American families. LBA member companies build across the residential spectrum from first-time and move-up homes to luxury and active-adult housing. In each of these segments, LBA members are leaders in construction quality, energy efficiency, design and the efficient use of land. Many of LBA's members are active in urban multi-family markets and also develop traditional and neo-traditional suburban communities. LBA's members, including in Texas, are directly and adversely impacted by the Rule. LBA joined WAC's comments on the Proposed Rule.

20.     Plaintiff **Matagorda County Farm Bureau** ("MCFB") is a non-profit grassroots organization whose purpose is to promote and develop agriculture in Matagorda County, Texas and to better the conditions and efficiency of its agricultural producers. MCFB has over 3,000 member families who are also all members of the Texas Farm Bureau, which submitted

---

[9] *Comments of the Associated General Contractors of America regarding Response to Proposed Revisions to the Definition of Waters of the United States, 86 Federal Register, 69,372 (Dec. 7, 2021); Docket ID No. EPA-HQ-OW-2021-0602*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

comments on the Proposed Rule on February 7, 2022.[10] The member family farmers and ranchers of Matagorda County are directly and adversely impacted by the Rule.

21.     Plaintiff **National Association of Home Builders** ("NAHB") is a national trade association incorporated in the State of Nevada. NAHB's membership includes more than 140,000 builder and associate members organized into approximately 700 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico. In Texas, NAHB has 29 local associations, including the Texas Association of Builders and the Greater Houston Builders Association. Its members include individuals and firms that construct single-family homes, apartments, condominiums, and commercial and industrial projects, as well as land developers and remodelers. NAHB's members, including in Texas, are directly and adversely impacted by the Rule. NAHB submitted comments on the Proposed Rule on February 7, 2022.[11] NAHB also joined WAC's comments.

22.     Plaintiff **National Association of REALTORS®** ("NAR") is the United States' largest trade association and represents over 1.5 million real estate professionals, including residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry. NAR advocates on behalf of its members to protect private property rights. Making up nearly 20 percent of the U.S. economy, the housing industry, and the NAR members that serve residential and commercial property buyers and sellers, are vital to promoting homeownership, which is often the foundational bridge to financial security for consumers. The freedom to buy, sell and utilize property underlies all real estate transactions and markets, and restrictions placed on property owners from realizing the highest and best use

---

[10] *Comments of the Texas Farm Bureau regarding Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[11] *Comments of the National Association of Home Builders regarding Docket ID No. EPA-HQ-OW-2021-0602; National Association of Home Builders Comments on Proposed WOTUS Definition, 86 Fed. Reg. 69372 (December 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

of that property hinders economic growth and development. NAR and its members, including in Texas, also support the responsible use and management of the nation's water resources, which ensures that residential, commercial, and industrial development may proceed without degrading the nation's water resources and without unreasonable regulatory encumbrances. NAR's members are directly and adversely impacted by the Rule. NAR has submitted comments on every proposed rule defining WOTUS since 2014, including comments on the Proposed Rule, which were submitted on February 7, 2022.[12] NAR also joined WAC's comments on the Proposed Rule dated February 7, 2022.

23.     Plaintiff **National Cattlemen's Beef Association** ("NCBA") is the national trade association representing U.S. cattle producers, with over 250,000 cattle producers represented through both direct membership and 44 state affiliate associations, including in Texas. NCBA represents America's farmers, ranchers and cattlemen who provide a significant portion of the nation's supply of food. NCBA works to advance the economic, political, and social interests of the U.S. cattle business and to be an advocate for the cattle industry's policy positions and economic interests. NCBA's members, including in Texas, are directly and adversely impacted by the Rule. NCBA and the Public Lands Council submitted joint comments on February 7, 2022.[13]

24.     Plaintiff **National Corn Growers Association** ("NCGA") was founded in 1957 and represents nearly 40,000 dues-paying corn farmers nationwide and the interests of more than 300,000 growers who contribute through corn checkoff programs in their states. NCGA and its

---

[12] *Comments of the Realtors Land Institute on the U.S. Environmental Protection Agency's and U.S. Army Corps of Engineers' Proposed Revised Definition of "Waters of the United States",* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[13] *Comments of the National Cattlemen's Beef Association, Public Lands Council, and Affiliate Livestock Associations on The Environmental Protection Agency and U.S. Army Corps of Engineers' Proposed Rule Revising the Definition of Waters of the U.S. 86 F.R. 69372,* Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

48 affiliated state organizations, including Corn Producers Association of Texas, work together to create and increase opportunities for corn growers. NCGA's members are directly and adversely impacted by the Rule. NCGA submitted comments on the Proposed Rule on February 7, 2022.[14] NCGA also joined AFBF's and WAC's comments.

25.     Plaintiff **National Mining Association** ("NMA") is the national trade association of the mining industry. NMA's members include the producers of most of the nation's coal, metals, and industrial and agricultural minerals; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms that serve the mining industry. NMA has members located throughout Texas. NMA's members are directly and adversely impacted by the Rule. NMA submitted comments on the Proposed Rule on February 7, 2022.[15] NMA also joined WAC's comments.

26.     Plaintiff **National Multifamily Housing Council** ("NMHC") is a national nonprofit association based in Washington, D.C., that represents the leadership of the apartment industry. NMHC members engage in all aspects of the apartment industry, including ownership, development, management and finance, who help create thriving communities by providing apartment homes for 38.9 million Americans, contributing $3.4 trillion annually to the economy. NMHC advocates on behalf of rental housing, conducts apartment-related research, encourages the exchange of strategic business information and promotes the desirability of apartment living. Over one-third of American households rent, and over 20 million U.S. households live in an apartment home (buildings with five or more units). NMHC's members are directly and adversely impacted by the Rule. NMHC joined WAC's comments on the Proposed Rule.

---

[14] *Comments of the National Corn Growers Association regarding Revised Definition of "Waters of the United States" 86 Fed. Reg. 69,372*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[15] *Comments of the National Mining Association regarding Proposed Revised Definition of "Waters of the United States" Step One Rulemaking, 86 Fed. Reg. 69372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

27.      Plaintiff **National Pork Producers Council** ("NPPC") is an association of 43 state pork producer organizations, including the Texas Pork Producers Association, and speaks on behalf of the nation's 67,000 pork producers. NPPC conducts public policy outreach at both the state and federal level with a the goal of meeting growing worldwide consumer demand for pork while simultaneously protecting the water, air, and other environmental resources that are in the care of or potentially affected by pork producers and their farms. NPPC and its members have engaged directly with EPA over the last two decades regarding the development of water quality standards and have made significant capital investments in the design and operation of farms to comply with these environmental regulations. NPPC's members are directly and adversely impacted by the Rule. NPPC joined AFBF's comments on the Proposed Rule.

28.      Plaintiff **National Stone, Sand and Gravel Association** ("NSSGA") is the leading advocate for the aggregates industry, which employs over 100,000 men and women. NSSGA members are responsible for the essential stone, sand and gravel found in road and public works projects as well as energy production, erosion control, wastewater, sewage, air pollution control, and drinking water purification systems. NSSGA's members are directly and adversely impacted by the Rule, including members in Texas, the state that produces the largest volume of aggregates in the U.S. NSSGA has engaged with EPA on this issue for decades, and submitted comments on February 7, 2022,[16] signed onto joint comments with a coalition of construction materials associations (NSSGA, National Asphalt Pavement Association, National

---

[16] *Comments of the National Stone, Sand & Gravel Association regarding Revised Definition of Waters of the United States Comments; EPA-HQ-OW-2021-0602; submitted via regulations.gov*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

Ready Mixed Concrete Association, and the Portland Cement Association) on February 7, 2022,[17] and joined WAC's comments on the Proposed Rule.

29.     Plaintiff **Public Lands Council** ("PLC") represents ranchers who use public lands and preserve the natural resources and unique heritage of the West. PLC is a Colorado nonprofit corporation headquartered in Washington, D.C. PLC's membership consists of state and national cattle, sheep, and grasslands associations, including in Texas. PLC works to maintain a stable business environment for public land ranchers in the West where roughly half the land is federally owned and many operations have, for generations, depended on public lands for forage. PLC's members are directly and adversely impacted by the Rule. PLC and NCBA submitted joint comments on February 7, 2022.[18]

30.     Plaintiff **Texas Farm Bureau** ("TFB") was established in 1933 as a non-profit, grassroots, agricultural association representing family farmers and ranchers in Texas. TFB is committed to the advancement of agriculture and prosperity for rural Texas and is a member of the AFBF. TFB has over 535,000 member families in Texas, including members who own or farm land in the Southern District of Texas and within the Galveston Division of this Court. TFB's mission is to be the voice of Texas Agriculture, to benefit all Texans through promotion of a prosperous agriculture for a viable, long-term domestic source of food, fiber, and fuel. Its member farmers and ranchers work their land and rely on water resources and thus are directly

---

[17] *Comments of the National Stone, Sand & Gravel Association, National Asphalt Pavement Association, National Ready Mixed Concrete Association and the Portland Cement Association regarding Revised Definition of "Waters of the United States"; EPA-HQ-OW-2021-0602; submitted via regulations.gov*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

[18] *Comments of the National Cattlemen's Beef Association, Public Lands Council, and Affiliate Livestock Associations on The Environmental Protection Agency and U.S. Army Corps of Engineers' Proposed Rule Revising the Definition of Waters of the U.S. 86 F.R. 69372*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

and adversely impacted by the Rule. The TFB submitted comments on the Proposed Rule on February 7, 2022.[19]

31.      Plaintiff **U.S. Poultry and Egg Association** ("USPOULTRY") is the world's largest and most active poultry organization. USPOULTRY's members include producers and processors of broilers, turkeys, ducks, eggs, and breeding stock, as well as allied companies. Formed in 1947, the association has affiliations in 27 states, including in Texas, and member companies in Texas and worldwide. USPOULTRY's members are directly and adversely impacted by the Rule. USPOULTRY joined AFBF's comments on the Proposed Rule.

**B.  Defendants**

32.      Defendant U.S. Environmental Protection Agency is the agency of the United States Government with primary responsibility for implementing the CWA. Along with the Corps, the EPA promulgated the Rule.

33.      Defendant Michael S. Regan is the Administrator of the EPA, acting in his official capacity. Administrator Regan signed the Rule on December 29, 2022.

34.      Defendant U.S. Army Corps of Engineers has responsibility for implementing the CWA. Along with the EPA, the Corps promulgated the Rule.

35.      Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General for the U.S. Army Corps of Engineers, acting in his official capacity.

36.      Defendant Michael L. Connor is the Assistant Secretary of the Army for Civil Works, acting in his official capacity. Assistant Secretary Connor signed the Rule on December 28, 2022.

---

[19] *Comments of the Texas Farm Bureau regarding Revised Definition of "Waters of the United States," 86 Fed. Reg. 69,372 (Dec. 7, 2021)*, Dkt. No. EPA-HQ-OW-2021-0602 (Feb. 7, 2022).

## STANDING

37.     The Plaintiffs have standing as member organizations whose members have standing and, independently, have organizational standing.

38.     The interests that each Plaintiff seeks to protect in this lawsuit are manifestly germane to its organizational purposes. Plaintiffs' members engage in a wide range of activities across a wide range of landscapes that are directly impacted by the Rule. A primary purpose of each Plaintiff is to represent and protect the interests of its members in federal rulemaking and in litigation, challenging unlawful federal regulations that adversely affect their members.

39.     Each Plaintiff's members own or work on land, or facilitate the sale of real property, that includes features that may constitute WOTUS under the Rule. Each Plaintiff's members must comply with (or assist property owners or buyers with understanding their compliance obligations under) the CWA and how that may affect their ownership and use of the subject property, including the CWA's prohibition against unauthorized "discharges" into any features that are within the Agencies' regulatory jurisdiction under the statute.

40.     Because the Rule is both vague and expansive in describing features that are purportedly WOTUS, and often requires time-consuming, costly, and unpredictable case-by-case determinations by landowners and by the Agencies, each Plaintiff's members or clients do not and cannot know which features on the lands they own or use or may purchase are covered by the CWA's permitting requirements and which are not. Uncertainty as to which features are jurisdictional under the vague and extremely broad terms of the Rule (including "tributary," "adjacent wetlands," "significantly affect," "interstate waters," and "intrastate lakes and ponds, streams, or wetlands not identified" in other sections of the WOTUS definition ("other jurisdictional intrastate waters")) deprives each Plaintiff's members or clients of notice of what

the law requires of them and makes it impossible for them or the property owners they assist to make informed decisions concerning the operation, logistics, and finances of their businesses.

41.     The costs of making a wrong decision under the CWA are harsh. A first-time criminal offense for negligently discharging into a WOTUS without a permit is punishable by criminal penalties of up to $25,000 per violation per day, and up to one year in prison per violation. 33 U.S.C. § 1319(c)(1). A first-time criminal offense for knowingly discharging into a jurisdictional water without a permit is punishable by criminal penalties of up to $50,000 per violation per day, and up to three years in prison per violation. 33 U.S.C. § 1319(c)(2). The EPA may also impose civil penalties of up to $64,618 per discharge, per day, per offense, without regard to any knowledge (or lack of knowledge) of the jurisdictional status of a particular feature. 33 U.S.C. § 1319(g)(2)(A); 40 C.F.R. § 19.4.

42.     Additionally, the CWA authorizes citizen suits by any "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Regardless of whether they are ultimately found liable, the regulated public can incur substantial costs defending against citizen suits, and the broad and vague definition of WOTUS under the Rule places the regulated community at greater risk of having to defend against such actions.

43.     Law-abiding members of each of the Plaintiffs have incurred or will imminently incur continuing economic costs as they alter their activities (in particular, by abstaining from certain activities in certain areas of land) to accommodate the possibility that their activities will be deemed discharges into land features that are later determined by the Agencies to be jurisdictional waters. *See*, *e.g.*, Declaration of Robert E. Reed at ¶ 14 (Texas farmer will take "about 5 percent of the field out of production" "to ensure compliance the Rule," which "would cost me about $1,400 an acre in revenue").

44.     Some of Plaintiffs' members have initiated or will soon initiate the process of retaining engineers and consultants and obtaining jurisdictional determinations, NPDES permits, additional oil spill control plans or countermeasures under Section 311, and Section 404 permits from the Agencies in order to comply or mitigate the risk of noncompliance with the Rule. Obtaining jurisdictional determinations and permits entails ongoing costs, including having to retain consultants, engineers, and lawyers over the course of years. *See* D. Sunding & D. Zilberman, *The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process*, 42 Nat. Res. J. 59, 74, 76 (2002) (an "individual permit application" costs on average "over $271,596 to prepare"; "the cost of preparing a nationwide permit application averages $28,915"; nationwide permits "took an average of 313 days to obtain"; "it took an average of 788 days (or two years, two months) from the time they began preparing the application to the time they received an individual permit"); *Rapanos*, 547 U.S. at 721 (similar); Declaration of Emily Coyner, NSSGA, at ¶ 14 ($540,000 cost of Section 404 permitting process); Declaration of Courtney Briggs, AFBF, at ¶¶ 19, 44, 50, 52; Declaration of N. Rebecca McGrew, The North American Coal Corporation, at ¶¶ 12-13; Declaration of Leah Pilconis, AGC, at ¶¶ 25-26.

45.     As explained in greater detail below, many land and water features covered by the Rule are not within the scope of any reasonable interpretation of the CWA and exceed the Agencies' statutory and constitutional authority. Thus the Rule has caused or will cause each Plaintiff's members or their clients economic and non-economic harm by unlawfully inhibiting their productive use, enjoyment, and improvement of land and water features on their lands and at their places of work.

46.     The Rule purports to establish the Agencies' jurisdiction over a wide range of features that are not properly WOTUS under the CWA or under the Supreme Court's interpretations of the Agencies' jurisdiction. That includes many drainage ditches, dry desert washes, intermittent or ephemeral channels, non-navigable interstate ponds, or any feature with any of a myriad of physical or non-physical connections to navigable or interstate waters on which they are deemed by the Agencies to have a "material influence" (using vague and undefined factors). Accordingly, the Rule unlawfully requires Plaintiffs' members and their clients either to alter their land use to avoid discharges to these features or to obtain costly permits for discharges. Vacatur of the Rule would remedy these ongoing injuries, including by eliminating continuing expenses of investigation, compliance, and mitigation, preventing arbitrary enforcement of the CWA, and allowing the fuller use and enjoyment of land and water features.

47.     Each Plaintiff has members who would have standing to sue in their own right as parties regulated under the CWA.

48.     Neither the claims asserted nor the relief requested require individual members' participation in this lawsuit.

49.     Plaintiffs and their members have been deeply involved with the development of the CWA for decades, including with the promulgation of the WOTUS definition. Many Plaintiffs submitted comments to the earlier 2015 and 2020 iterations of the proposed WOTUS definition, and have participated in roundtables and other conversations with government regulators over many years to explain the costs and impacts of the proposed rules. Declaration of Emily Coyner, NSSGA, at ¶ 6; Declaration of Courtney Briggs, AFBF, at ¶¶ 13-31; Declaration of Robin Rorick, API, at ¶¶ 8-9.

50.     Many of the Plaintiffs have engaged in previous rounds of litigation addressing prior WOTUS rules, including as plaintiffs challenging the 2015 Rule and as intervenor-defendants defending the 2020 Rule.[20] Some submitted briefs amicus curiae to the Supreme Court in *SWANCC*, *Rapanos*, *Sackett v. Envtl. Prot. Agency*, No. 21-454, and other cases.[21]

51.     Plaintiffs invest substantial resources in a range of activities designed to protect and promote property rights and to assist their members with the gainful use of their land, including developing and defending uniform water quality standards and other accredited standards designed to ensure compliance with the CWA and other environmental laws. Plaintiffs devote substantial resources toward lobbying and other efforts to advocate for a reasonable scope of federal jurisdiction under the CWA. And Plaintiffs continually advise and counsel their members when changes to the CWA are proposed or implemented. The Rule frustrates and impairs those advocacy and advisory activities and consequently will consume the Plaintiffs' resources. The Plaintiffs accordingly have suffered remediable injuries in their own right. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378-79 (1982).

52.     Contrary to the Agencies' assertions in its explanations of the Rule, the Rule does not simply restore the Agencies' approach to WOTUS set forth in rules and guidance promulgated prior to 2015.[22] Take the post-*Rapanos* 2008 guidance: *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States &*

---

[20] For example, some amici were plaintiffs in two suits in which courts held unlawful the 2015 Rule: *Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019); *American Farm Bureau Federation v. EPA*, No. 15-cv-165 (S.D. Tex. Sept. 12, 2018), Dkt. 87 (AFBF).  And some amici were intervenor-defendants in suits challenging the 2020 Rule or NWPR. *See e.g.*, *Colorado v. U.S. EPA*, No. 20-1238 (10th Cir. Mar. 2, 2021) (reversing preliminary injunction against NWPR); *South Carolina Coastal Conservation League v. Regan*, No. 20- cv-01687 (D.S.C. July 15, 2021), Dkt. 147 (remanding NWPR to Agencies without vacatur).

[21] *See, e.g.*, Amicus Br. for Fourteen National Agricultural Organizations; Amicus Br. for API; Amicus Br. for NAHB; Amicus Br. for NCBA; Amicus Brief for NSSGA and ARTBA; Amicus Br. of TFB *et al.;* each filed in *Sackett v. EPA*, No. 21-454 (U.S. Sup. Ct).

[22] The Agencies admit that the Rule goes beyond the pre-2015 regime when they describe the Rule as "the agencies' pre-2015 definition of 'waters of the United States,' implemented consistent with relevant case law and longstanding practice, as informed by applicable guidance, training, and experience." 88 Fed. Reg. at 3006, n.6.

*Carabell v. United States* ("2008 Guidance").[23] To start, the Rule codifies elements of that guidance, giving *binding legal force* to guidelines that previously had none. *See* 2008 Guidance at 4, n. 17 (stating that the 2008 Guidance has no legal effect).[24]

53.     Additionally, the Rule substantively differs from the Agencies' pre-2015 position in important ways. Some examples of these differences are: (1) the Rule significantly broadens the reach of the Agencies' authority compared to the pre-2015 regime by using an overbroad interpretation of the "significant nexus" (and "relatively permanent") standard that underpinned the 2015 Rule, not the pre-2015 guidance;[25] (2) the Rule includes a catch-all category of "other jurisdictional intrastate waters" not identified elsewhere in the Rule as a WOTUS, broadens the Agencies' authority under the Rule by applying the "relatively permanent" and "significant nexus" standards to many currently non-jurisdictional water features that are outside of any stream network (88 Fed. Reg. at 3029); (3) because more waters will become jurisdictional compared to the pre-2015 regulatory regime—at a minimum, those "waters" that will be deemed jurisdictional for the first time under the "other jurisdictional intrastate waters" category—more facilities will be subject to Section 311 Spill Prevention, Control, and Countermeasures requirements based on their proximity to formerly non-jurisdictional, non-navigable, intrastate

---

[23] *Available at* https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos_120208.pdf.

[24] The 2008 Guidance specifically states

>    The CWA provisions and regulations described in this document contain legally binding requirements. This guidance does not substitute for those provisions or regulations, nor is it a regulation itself. **It does not impose legally binding requirements on EPA, the Corps, or the regulated community**, and may not apply to a particular situation depending on the circumstances. **Any decisions regarding a particular water will be based on the applicable statutes, regulations, and case law**. Therefore, interested persons are free to raise questions about the appropriateness of the application of this guidance to a particular situation, and EPA and/or the Corps will consider whether or not the recommendations or interpretations of this guidance are appropriate in that situation based on the statutes, regulations, and case law.

2008 Guidance at 4, n. 17 (emphasis added).

[25] *The Clean Water Rule: Definition of "Waters of the United States,"* 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule").

water features; and (4) the assertion of jurisdiction over additional tributaries and wetlands compared to the pre-2015 regulatory regime will result in increased permitting requirements.

54. The Agencies repeatedly but incorrectly assert that "their interpretations [of WOTUS] remained largely unchanged between 1977 and 2015" and that the new Rule "is founded on that familiar pre-2015 definition that has bounded the Clean Water Act's protections for decades, has been codified multiple times, and has been implemented by every administration in the last 45 years." 88 Fed. Reg at 3005. To the contrary, the key, most expansive, and vaguest element of the Rule derives from a misreading of the opinion of a single Justice in *Rapanos* in 2006—an opinion that, even when read correctly, was rejected by the other eight Justices—and that has no analogue in the Agencies' pre-*Rapanos* rules or guidance. And the 1977 regulations defined WOTUS to include "isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters . . . the degradation or destruction of which could affect interstate commerce" (33 CFR 323.2(a)(5) (1978)), but the Supreme Court in SWANCC rejected that basis of jurisdiction over isolated features, stating that what Congress "had in mind as its authority for enacting the CWA" was not this "affects commerce" head of interstate commerce, but the transport of goods and people using the navigable waters. 531 U.S. at 172. The Agencies' claims of consistency, and their expectation of deference, carry no weight when their regulations rested on a view of the CWA and its Commerce Clause roots rejected in SWANCC, when the "significant nexus" concept did not appear in agency guidance until after Rapanos, when the Supreme Court has consistently rejected the Agencies' interpretations of the CWA as to both substance and procedure (*SWANCC*, *Rapanos*, *Sackett I*, *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016), *NAM*), and when courts (including this one) held both the 2015 and 2020 rules to be unlawful (see ¶ 55 *infra*). That history shows not

that the Agencies have experience, expertise, and a decades-long consistent approach that warrant deference to the current Rule, but the opposite: that the Agencies' flip-flopping rules and guidance have lacked any firm basis in the CWA, making it critical for the courts to step in to provide the "durable" definition of jurisdiction that the Agencies have so spectacularly failed to provide since 1972.

## BACKGROUND

### A.    Procedural Background

55.    Following the Supreme Court's decision in *Rapanos*, the Agencies promulgated the 2008 Guidance interpreting WOTUS.[26] After members of the regulated community (including many of the Plaintiffs here) complained that this non-binding guidance was unworkably vague and requested a rulemaking to provide a clear definition, the Agencies promulgated the 2015 Rule.[27] Far from providing the requested clarity, the 2015 Rule left WOTUS just as (if not more) vague and uncertain—indeed unbounded—and relied on arbitrary factors with no basis in the CWA. Many of the Plaintiffs here (and others) challenged the 2015 Rule, which two district courts held to be procedurally and/or substantively unlawful, remanding it to the Agencies.[28] Thereafter, the Agencies withdrew the 2015 Rule[29] and promulgated a new rule, the 2020 Rule,[30] which in turn was challenged, and which many of the Plaintiffs here defended as intervenors in the litigation.[31] That 2020 Rule was vacated.[32]

---

[26]    2008 Guidance, *available at* *https://www.epa.gov/sites/default/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf*.

[27] 2015 Rule, 80 Fed. Reg. 37,054.

[28] *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1344 (S.D. Ga. 2019); *Tex. v. United States Envtl. Prot. Agency*, 389 F. Supp. 3d 497, 499 (S.D. Tex. 2019).

[29] Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule").

[30] 2020 Rule, 85 Fed. Reg. 22,250.

[31] *See Colorado v. EPA*, 1:20-cv-01461 (D. Colo. 2020); *Envtl. Integrity Project v. Regan*, 1:20-cv-01734 (D.D.C. 2020); *South Carolina Coastal Conservation League v. Regan*, 2:20-cv-01687 (D.S.C. 2020).

56.     Following the vacatur of the 2020 Rule, the Defendants on December 7, 2021, published a new Proposed Rule defining WOTUS.[33]

57.     Many of the Plaintiffs submitted joint comments on the Proposed Rule on February 7, 2022, and many also submitted individual comments. *See supra,* at ¶¶ 15-31.

58.     On December 28 and 29, 2022, Defendants signed a Final Rule defining WOTUS.

59.     On January 18, 2023, the Final Rule was published in the Federal Register. 88 Fed. Reg. 3004. The effective date of the Rule is March 20, 2023. *Id.*

60.     The Rule is a "final agency action" within the meaning of 5 U.S.C. § 704 and is therefore immediately subject to challenge in this Court.

## B.     Supreme Court Precedent Cabins The Permissible Scope Of The Agencies' Rulemaking

61.     The Rule is the Agencies' most recent attempt to define WOTUS. The Agencies' efforts were undertaken against the backdrop of three Supreme Court cases addressing the meaning of WOTUS, with a fourth Supreme Court decision due soon. The Supreme Court first addressed the interpretation of "waters of the United States" within the meaning of 33 U.S.C. § 1362(7) in *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985). That case concerned a wetland that "was adjacent to a body of navigable water," because "the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property" to "a navigable waterway." *Id.* at 131. Noting that "the Corps must necessarily choose some point at which water ends and land begins" (*id.* at 132), the Court upheld the Corps's interpretation of "the waters of the United States" to include a wetland that is directly connected to, and thus "actually abuts on a navigable waterway." *Id.* at 135.

---

[32] *Pascua Yaqui Tribe v. United States Envtl. Prot. Agency*, 557 F. Supp. 3d 949, 956 (D. Ariz. 2021), appeal dismissed sub nom. *Pascua Yaqui Tribe v. U.S. Envtl. Prot. Agency*, No. 21-16791, 2022 WL 1259088 (9th Cir. Feb. 3, 2022).

[33] Proposed Rule, 86 Fed. Reg. 69,372.

62.     The Supreme Court next addressed the interpretation of WOTUS in *SWANCC*, 531 U.S. 159 (2001). Following the Court's decision in *Riverside Bayview*, the Corps had "adopted increasingly broad interpretations of its own regulations under the Act." *Rapanos*, 547 U.S. at 725. At issue in *SWANCC* was the so-called Migratory Bird Rule, which purported to extend the Agencies' jurisdiction under the CWA to any intrastate waters "[w]hich are or would be used as habitat" by migratory birds. 51 Fed. Reg. 41217. In *SWANCC*, the Supreme Court considered the application of that rule to "an abandoned sand and gravel pit in northern Illinois." 531 U.S. at 162. Observing that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed [the Court's] reading of the CWA in *Riverside Bayview*," the Court held that these "nonnavigable, isolated, intrastate waters," which did not "actually abut[] on a navigable waterway," were not "waters of the United States." *Id.* at 167, 171.

63.     In so ruling, as relevant here, the Court in *SWANCC* held that (1) the term "navigable waters" had to be given some meaning, (2) "Congress had in mind as its authority for enacting the CWA" its "traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made," (3) "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power," the agency must be able to point to "a clear indication that Congress intended that result," (4) this clear statement rule "is heightened where the administrative interpretation alters the federal-state framework" through "a significant impingement of the States' traditional and primary power over land and water use," (5) the CWA is to be read "to avoid . . . significant constitutional and federalism questions," (6) "the text of the [CWA] will not allow" the Agencies to "exten[d jurisdiction] to ponds that are not adjacent to open water," and (7) CWA § 404(g) is "unenlightening" as to the scope of jurisdictional waters beyond traditional navigable waters. *Id.* at 171, 173-74.

64.     Finally, in *Rapanos*, the Court "consider[ed] whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute 'waters of the United States' within the meaning of the [CWA]." 547 U.S. at 729. Prior to *Rapanos*, "the Corps [had] interpreted its own regulations to include 'ephemeral streams' and 'drainage ditches' as 'tributaries' that are part of the 'waters of the United States.'" *Id.* at 725 (citing 33 C.F.R. § 328.3(a)(5)). "This interpretation [had] extended 'the waters of the United States' to virtually any land feature over which rainwater or drainage passes and leaves a visible mark." *Id*. Writing for a four-Justice plurality, Justice Scalia, focusing on the usual understanding of the word "waters," rejected that interpretation, holding that WOTUS "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id*. at 739. Instead, the "only plausible interpretation" of WOTUS is as a reference to "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" *Id.* Justice Kennedy, concurring in the judgment, agreed that jurisdiction may have been lacking in *Rapanos* because there may not have been a requisite "significant nexus" between the waterbodies at issue and any navigable waters. *Id*. at 759-87.

65.     Five justices of the Court, including the four-justice plurality and Justice Kennedy, agreed on certain aspects of the WOTUS definition: (1) the word "navigable" in the CWA must be given some effect, *Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring); *see id*. at 731 (plurality); (2) WOTUS includes some waters and wetlands not navigable-in-fact but which bear a substantial connection to navigable waters, *id*. at 739, 742 (plurality); *id*. at 784-85 (Kennedy, J.); (3) environmental concerns cannot override the statutory text, *id*. at 778

(Kennedy, J.); and (4) WOTUS cannot include drains, ditches, streams remote from navigable-in-fact water and carrying only a small volume water toward navigable-in-fact water, or waters or wetlands that are alongside a drain or ditch, *id*. at 733-34, 742 (plurality), *id*., at 778-91 (Kennedy, J.). Those are conclusions about the core meaning of WOTUS that the Agencies cannot override in their subsequent rulemaking.

66.    The Supreme Court recently heard oral argument in a case that asks it to consider the proper test for determining whether wetlands are "waters of the United States." *Sackett v. Envtl. Prot. Agency*, No. 21-454 (argued Oct. 3, 2022). Rather than await the decision in that case, which will almost certainly provide additional guidance as to the meaning of WOTUS, the Agencies finalized the challenged Rule.

## C.    The Proposed Rule and the Comment Process

67.    In response to *Riverside Bayview*, *SWANCC*, *Rapanos*, and litigation concerning the 2015 and 2020 Rules, the Defendants proposed a new Rule redefining the term "waters of the United States."[34]

68.    Despite the Supreme Court's rejection in *Rapanos* of the Agencies' attempts to assert jurisdiction over non-navigable waters that have a "mere hydrologic connection" to navigable waters (*Rapanos*, 547 U.S. at 739-40 (plurality); *see also id.* at 784-85 (Kennedy, J., concurring)), the Agencies' proposal relied on EPA's so-called Connectivity Report[35] to justify an impermissibly expansive "significant nexus" standard to claim nearly limitless jurisdiction that does not depend on even a hydrologic connection.[36]

---

[34] Proposed Rule, 86 Fed. Reg. 69,372.

[35] U.S. Environmental Protection Agency, *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence* (Final Report), EPA/600/R–14/ 475F (2015), *available at* https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414 ("Connectivity Report").

[36] *See* U.S. Environmental Protection Agency and U.S. Army Corps of Engineers, *Technical Support Document for the Proposed "Revised Definition of 'Waters of the United States'" Rule* 27 (Nov. 18, 2021) ("The Science Report

69.     Defendants' also conducted a flawed cost-benefit analysis that dramatically underestimated certain costs imposed by the Rule, omitted other relevant costs from the analysis entirely, and overestimated certain benefits of the Rule.[37] As one example, commenters on the Proposed Rule explained that unavoidable adverse impacts to newly jurisdictional features would require current permit-holders to engage in additional compensatory mitigation, such as mitigation banks and in-lieu fee programs. EPA's economic analysis in support of the Proposed Rule dramatically underestimated increased mitigation costs. Commenters also explained that the Rule's vagueness would increase costs of compliance, including defending against additional enforcement actions and citizen suits. EPA's economic analysis did not properly account for these and many other costs, and lacked proper documentation and explanation.

70.     Defendants also failed meaningfully to consider the direct economic costs the Rule imposes on small businesses.

71.     Additionally, Defendants failed to solicit or consider flexible regulatory proposals under the Regulatory Flexibility Act or to explain the rationale for their actions to assure that any such proposals were given serious consideration.

72.     The Proposed Rule also did not address how the Rule would affect jurisdictional determinations made under the prior 2020 Rule. Instead, the Rule left the door open for the Agencies to decide that previously compliant members of Plaintiffs are now noncompliant. Indeed, the Agencies have expressly warned that the "Corps will not rely on an AJD [Approved Jurisdictional Determination] issued under the NWPR (a "NWPR AJD") in making a new permit

---

provides much of the technical support for this proposed rule"), *available at* https://www.epa.gov/system/files/documents/2021-12/tsd-proposedrule_508.pdf.

[37] U.S. Environmental Protection Agency and Department of Defense, *Economic Analysis for the Proposed "Revised Definition of 'Waters of the United States'" Rule* (Nov. 17, 2021), *available at* https://www.regulations.gov/document/EPA-HQ-OW-2021-0602-0083.

decision." EPA, *Current Implementation of Waters of the United States*.[38] The Agencies' position is without precedent, untenable, and ignores the Supreme Court's characterization of a no-jurisdiction AJD as "a five-year safe harbor from liability under the" CWA (*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016)).

**D.     The Final Rule**

73.     The Rule interprets the term "waters of the United States" to include:

- traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters");

- impoundments of "waters of the United States" ("paragraph (a)(2) impoundments");

- tributaries to traditional navigable waters, the territorial seas, interstate waters, or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries");

- wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and

- intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters").

88 Fed. Reg. at 3005–06.

74.     "Traditional navigable waters" are "all waters that are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 88 Fed. Reg. at 3070; 33 CFR 328.3(a)(1) (2014); 40 CFR 122.2, 230.3(s)(1) (2014).

---

[38] *Available at* https://www.epa.gov/wotus/current-implementation-waters-united-states.

75. "Interstate waters" are "all rivers, lakes, and other waters that flow across, or form a part of, state boundaries," which need not be navigable and "need not meet the relatively permanent standard or significant nexus standard." 88 Fed. Reg. at 3073–74; *see id.* at 3012 (33 C.F.R. 328.3(a)(2) ("All interstate waters including interstate wetlands" are deemed WOTUS)).

76. "Territorial seas" are "the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles." 88 Fed. Reg. at 3072; CWA § 502(8).

77. For "impoundment," the Rule provides examples of when an "impoundment" may qualify as a "water," but the Rule does not define what constitutes an "impoundment." 88 Fed. Reg. at 3075. Moreover, the Rule notes that jurisdictional impoundments include both "impoundments created by impounding one of the 'waters of United States' that was jurisdictional under this rule's definition at the time the impoundment was created"—regardless of whether the impounded water remains jurisdictional—and "impoundments of waters that at the time of assessment meet the definition of 'waters of the United States' under the [R]ule . . . regardless of the water's jurisdictional status at the time the impoundment was created." *Id.*

78. A jurisdictional "tributary" "includes natural, human-altered, or human-made water bodies that flow directly or indirectly through another water or waters to a traditional navigable water, the territorial seas, or an interstate water," or impoundments of jurisdictional waters. 88 Fed. Reg. at 3083. Tributary also includes "the entire reach" of the stream that is "of the same Strahler stream order (i.e., from the point of confluence, where two lower order streams meet to form the tributary, downstream to the point such tributary enters a higher order stream)." *Id.* at 3086. The tributary may meet either the relatively permanent standard or the significant

nexus standard—so that a feature remote from a navigable water and with only intermittent or ephemeral flow may nevertheless be considered a "tributary."

79.     The "ordinary high water mark" ("OHWM") "defines the lateral limits of jurisdiction in non-tidal waters, provided the limits of jurisdiction are not extended by adjacent wetlands." 88 Fed. Reg. at 3119.  OHWM is defined broadly and vaguely as "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, and other appropriate means that consider the characteristics of the surrounding areas." *Id.*; 33 C.F.R. 328.3(c)(6). The Rule explains that "field indicators, remote sensing, and mapping information can also help identify an OHWM." 88 Fed. Reg. at 3083.

80.     The use of remote sensing and mapping tools is not limited to identifying traditional navigable waters.  Instead, the Rule authorizes using these tools to "determine whether waters are connected or sufficiently close to 'waters of the United States'" to be WOTUS, allowing regulators to make determinations remotely without ever viewing the "water feature" in person. 88 Fed. Reg. at 3137.

81.     For "adjacent wetlands," "adjacent" is defined as "bordering, contiguous, or neighboring." 88 Fed. Reg. at 3089. Those terms, including the vague term "neighboring," are not further defined in the Rule except to state that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are adjacent wetlands." *Id.*

82.     An adjacent wetland must meet either the relatively permanent standard or the significant nexus standard. The Rule defines adjacent wetlands that would be jurisdictional

broadly and vaguely to include not only "wetlands adjacent to paragraph (a)(1) waters [traditional navigable waters, the territorial seas, and interstate waters]," but also "wetlands adjacent to and with a continuous surface connection to relatively permanent paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard." 88 Fed. Reg. at 3006.

83.     Applying the Rule's interpretation will result in case-specific, time-consuming, and inconsistent analyses. The Rule allows for case-specific assertions of jurisdiction over a broad category of "waters." 88 Fed. Reg. at 3024. And the "other intrastate jurisdictional waters" category encompasses many intrastate, non-navigable water features that were previously considered to be "isolated" and thus not within the CWA's jurisdiction. *See SWANCC*, 531 U.S. at 167, 171;88 Fed. Reg. at 3033. The Rule provides no clear guidance on how the Agencies will interpret this overbroad catch-all category of WOTUS, leaving Plaintiffs and their members exposed to an undeterminable liability.

84.     Particularly problematic is the "intrastate lakes and ponds, streams, or wetlands not identified" category, which includes features identified using either the "relatively permanent standard" *or* the "significant nexus standard." 88 Fed. Reg. at 3033. Allowing the Agencies to assert jurisdiction under either standard impermissibly adopts the dissent's view in *Rapanos*—a view rejected by five Justices—instead of requiring that *both* standards be met before the Agencies can assert jurisdiction. *Rapanos*, 547 U.S. at 797-98 (Stevens, J., dissenting). The Agencies then aggravate this problem by misapplying the two standards to expand the scope of their jurisdiction beyond the limits articulated by the Supreme Court in *Rapanos* and its other precedent. 88 Fed. Reg. at 3034.

85.     The "relatively permanent standard" means "waters that are relatively permanent, standing or continuously flowing waters connected to paragraph (a)(1) waters, and waters with a continuous surface connection to such relatively permanent waters or to paragraph (a)(1) waters." 88 Fed. Reg. at 3038. The Rule does not define "relatively permanent." Further complicating application of this standard, the Rule notes that although "there must be a continuous surface connection on the landscape for waters assessed under paragraph (a)(5) to be jurisdictional under the relatively permanent standard," a "continuous surface connection does not require a constant hydrologic connection." *Id.* at 3102.

86.     The "significant nexus standard" means "waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, the territorial seas, or interstate waters—i.e., the paragraph (a)(1) waters." 88 Fed. Reg. at 3006. The Rule's use of vague terms—such as "similarly situated," "in the region," "significantly affects," and "chemical, physical, or biological integrity"—are highly ambiguous and potentially extremely expansive concepts that leave Plaintiffs to guess about what features on their properties may be deemed jurisdictional. *Id.*

87.     The Rule does not clearly define "similarly situated" or "in the region." Instead, the Agencies interpret "similarly situated" to mean "waters that are providing common, or similar, functions for paragraph (a)(1) waters such that it is reasonable to consider their effects together." 88 Fed. Reg. at 3127. That leaves Plaintiffs uncertain about what "functions" are similar enough in type or in magnitude to satisfy this vague "reasonableness" standard. Similarly, the Agencies interpret "in the region" to mean the feature "lie[s] within the catchment area of the tributary of interest." *Id.* at 3088. That leaves Plaintiffs and their members wondering

if a low spot in a field is a WOTUS, and would cause them the unnecessary burden of looking not just at their own land, but at any feature that might be deemed "similar" located anywhere in a potentially vast and ill-defined area.

88.      The Rule vaguely defines "significantly affect" as "'a material influence on the chemical, physical, or biological integrity of' a paragraph (a)(1) water." 88 Fed. Reg. at 3067. To apply this standard, the Agencies look to vague factors like "distance from a paragraph (a)(1) water," "hydrologic factors," the waters that have been determined to be "similarly situated," and "climatological variables." *Id.* This opaque definition provides no guidance on how Plaintiffs and their members are to determine if land contains a jurisdictional feature. And these undefined concepts ensure no landowner can ever look at its property and know whether the land contains a WOTUS until the Agencies reveal the answer. This substantially increases the costs and burdens for many of Plaintiffs' members who will have to either seek costly jurisdictional determinations or permits in an abundance of caution in case the EPA determines that their land contains a "water" or remove their land from use.

89.      The Agencies' approach to establishing a "significant nexus" to navigable waters differs substantially from that set forth in Justice Kennedy's concurring opinion in *Rapanos* and is therefore significantly different than the previous Guidance. For example, the Rule broadens the "significant nexus" standard by replacing an "and" with an "or" in Justice Kennedy's significant nexus test, which requires that the wetland "significantly affect the chemical, physical, ***and*** biological integrity of other covered waters more readily understood as 'navigable.'" *Rapanos*, 547 U.S. at 780 (emphasis added). And the Rule expands federal jurisdiction over features that Justice Kennedy stated are not WOTUS, such as ephemeral

drainages, many ditches, and non-navigable interstate waters. *Id.* at 784 (Kennedy, J., concurring); *see also id*. at 728, 732 n. 5 (plurality).

> **E.     The Final Rule is Unlawful**

90.     The Rule violates the Constitution, the CWA, and the APA for multiple reasons, including but not limited to the following:

a) The Rule expands Defendants' CWA jurisdiction far beyond the bounds of the Commerce Clause and the federalism limits embodied in the Constitution, the authority delegated to the Agencies by the CWA, and governing Supreme Court precedent.

b) The Rule concerns an issue of "vast 'economic and political significance.'" Yet Congress provided no "clear statement" that the Agencies' have authority to regulate that expansively. Accordingly, the Rule violates the "major questions" doctrine.

c) The Rule impermissibly asserts CWA jurisdiction over all interstate waters (and all waters related to interstate waters in ways specified in the Rule), for which there is no constitutional or statutory basis. *See Wheeler*, 418 F. Supp. 3d at 1360 ("[T]he Agencies' inclusion of all interstate waters within the definition of waters of the United States in the WOTUS Rule extends beyond their authority under the CWA.").

d) The Rule purports to establish jurisdiction over a broad category of "intrastate lakes and ponds, streams, or wetlands not identified" in the Rule that satisfy the Agencies' new version of the significant nexus standard, no matter how remote from navigable waters, including intermittent streams and ditches and ephemeral washes, and isolated features with no physical connection to a traditionally navigable water.

e) The Rule is vague and fails to put regulated parties on notice of when their conduct violates the law. Plaintiffs and their members cannot reasonably determine based on the

face of the Rule what is required of them. The Rule's definitions of tributaries, adjacency, interstate waters, and significant nexus, among others, are unconstitutionally vague, violate due process, are not authorized by the CWA, and are arbitrary and capricious and unsupported by law. For example, the Rule's significant nexus test, which is not supported by any plausible reading of *Rapanos* and is contrary to the Court's holding in *SWANCC*, is hopelessly vague. Regulated parties have no way to know, *ex ante,* which waters have a "significant nexus" to jurisdictional waters. The test relies on subjective terms like "similarly situated," "in the region," and "material influence." Instead of bringing clarity and certainty to the Agencies' jurisdiction under the CWA, the Rule leaves the definition of "waters of the United States" subjective and unpredictable. Regulated parties are wholly dependent on the Agencies', courts', and citizen-activists' subjective *ex post* evaluations and cannot know on the face of the Rule what conduct is prohibited.

f) Under the Rule's definition of tributary, it is impossible to know whether particular features qualify as jurisdictional "tributaries" without a case-specific and subjective determination by the Agencies. The criteria set by the Rule require subjective determinations such as whether the feature at issue possesses the relevant indicia of a bed, bank, and OHWM. And the Rule explains that the Agencies may rely on "remote sensing and mapping information," (88 Fed. Reg. at 3083), meaning that the Agencies can make determinations remotely from a desk, using satellite images and estimation software unavailable to the public, without actually ever viewing the "water feature" in person, and regardless of whether the purported physical characteristics are in fact observable or even present in the field.

g) The Rule's concept of "adjacent" wetlands is inconsistent with the Supreme Court's decisions in *Riverside Bayview* and *SWANCC*. It is also vague and uncertain because it

rests on relationships (like "neighboring") to features (like tributaries) that are themselves vague, leaving Plaintiffs and their members guessing as to whether particular wetlands are "adjacent." *See* 88 Fed. Reg. at 3089.

h) The Rule disregards the federalism restraints on the Agencies' assertions of jurisdiction, embodied in Congress's statement in the CWA that it intended the Act to preserve and protect the primary authority of States over the use of land and water.

i) The Rule's case-specific significant nexus test violates the Due Process Clause, the APA, and the plain language of the CWA. The term "region" as used in the Rule will require land users to know and assess enormous land areas well beyond their own holdings—without providing clear instructions about which other land areas must be considered.

j) The Rule fails to establish the precision and guidance necessary so that those enforcing this law, which carries both criminal and civil penalties, do not act in an arbitrary or discriminatory way.

k) Because a violation of the CWA carries significant criminal and civil penalties, "waters of the United States" must be narrowly defined to comport with the rule of lenity—not vaguely and expansively defined as in the Rule.

91. Alternatively, the Rule should be vacated because 33 U.S.C. § 1362(7) fails to supply an intelligible principle to guide the Agencies' rulemaking, and thus violates Article I, section 1 of the Constitution, which vests legislative authority exclusively in Congress.

## CLAIMS FOR RELIEF

### First Cause of Action: Violation of 5 U.S.C. § 706(2)(A)

92. Plaintiffs incorporate by reference the preceding allegations of this Complaint.

93.     The Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of 5 U.S.C. § 706(2)(A) because, among other things, the Rule is unsupported by law, unsupported by the scientific and economic evidence that was before the Agencies, and is inconsistent with the plain language of the CWA.

### Second Cause of Action: Violation of 5 U.S.C. § 706(2)(B)

94.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

95.     The Rule is "contrary to constitutional right, power, privilege, or immunity" in violation of 5 U.S.C. § 706(2)(B) because, among other things, the Rule exceeds the Agencies' authority under the Commerce Clause of Article I, Section 8 insofar as it regulates waters that are not channels of interstate commerce and otherwise bear no connection to interstate commerce; and violates the Due Process Clause of the Fifth Amendment to the United States Constitution insofar as it fails to give fair notice of what conduct is forbidden under the criminal provisions of the Clean Water Act and grants impermissible ad hoc discretion to the Defendants, guaranteeing arbitrary enforcement.

### Third Cause of Action: Violation of 5 U.S.C. § 706(2)(C)

96.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

97.     The Rule was promulgated "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of 5 U.S.C. § 706(2)(C) because the definition of "waters of the United States" in the Rule is inconsistent with, and in excess of, the Defendants' statutory authority under the CWA.

### Fourth Cause of Action: Violation of the Major Questions Doctrine

98.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

99.     Before an agency can decide an issue of major national significance, the agency's action must be supported by clear statutory authorization. In applying this "major questions" doctrine, the Supreme Court has denied agency claims of regulatory authority when (1) the underlying claim of authority concerns an issue of "vast 'economic and political significance,'" and (2) Congress has not clearly empowered the agency. *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014).

100.     The Rule regulates private conduct, requiring land owners and users to obtain permits or face severe civil and criminal liability for ordinary uses of their land, over enormous swaths of the United States, and under regulations of uncertain scope and that effectively operate as a national, federal land-use law that displaces local authority. The Rule thus concerns an issue of "vast 'economic and political significance.'" And the CWA does not plainly authorize the Agencies to assert jurisdiction over ditches, intermittent streams, ephemeral drainages, interstate ponds, or wet areas, among others, that are connected to navigable waters only by virtue of some "chemical, physical, or biological" nexus. As a result, the Rule violates the major questions doctrine.

### Fifth Cause of Action: Violation of 5 U.S.C. § 706(2)(D)

101.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

102.     The Rule was promulgated "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D) because, among other things, Defendants failed to undertake a regulatory flexibility analysis as required by the Regulatory Flexibility Act of 1980, as amended, 5 U.S.C. § 601–612.

### Sixth Cause of Action: Violation of Art. I, Sec. 1 of the Constitution, the Nondelegation Doctrine, and 5 U.S.C. § 706(2)(A), (B), and (C)

103.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

104.    The Rule was promulgated "not in accordance with law," "contrary to constitutional … power," and "in excess of statutory . . . authority" because Congress failed in 33 U.S.C. § 1362(7) to supply an intelligible principle to constrain the Agencies' rulemaking, and thereby unlawfully delegated legislative powers to the Agencies that Article I, section 1 of the Constitution reserves exclusively to Congress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(1) declare that the Rule is unlawful because its promulgation was arbitrary, capricious, an abuse of discretion, and not in accordance with law;

(2) declare that the Rule is unlawful because it exceeds the government's authority under the Commerce Clause, violates the Due Process Clause of the Fifth Amendment, and is otherwise contrary to constitutional rights and powers;

(3) declare that the Rule is unlawful because it is inconsistent with, and in excess of, the Defendants' statutory authority under the CWA and constitutional authority under Article I, section 1 of the Constitution;

(4) declare that the Rule is unlawful because it violates the "major questions" doctrine;

(5) declare that the Rule is unlawful because Congress did not delegate to the Agencies the authority to promulgate it;

(5) declare that the Rule is unlawful because it was promulgated without observance of procedure required by law;

(6) enter an order vacating the Rule;

(7) enjoin Defendants from implementing, applying, or enforcing the Rule;

(8) award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation under the Equal Access to Justice Act, 28 U.S.C.

§ 2412(d); and

(9) grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated:  January 18, 2023                                Respectfully submitted,

/s/ Kevin S. Ranlett
Kevin S. Ranlett
Texas Bar No. 24084922
SDTX No. 1124632
James B. Danford, Jr.
Texas Bar No. 24105775
SDTX No. 3150442
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, TX 77004
Tel:  713-238-2700
Email: kranlett@mayerbrown.com
Email: jdanford@mayerbrown.com

Timothy S. Bishop (*pro hac vice pending*)
Brett E. Legner (*pro hac vice pending*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Email: tbishop@mayerbrown.com
Email: blegner@mayerbrown.com

*Counsel for Plaintiffs*