**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

_____

|  |  |  |
|---|---|---|
| AMERICAN FARM BUREAU FEDERATION, *et al.,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in his official capacity as ADMINISTRATOR OF U.S. ENVIRONMENTAL PROTECTION AGENCY; U.S. ARMY CORPS OF ENGINEERS; LIEUTENANT GENERAL SCOTT A. SPELLMON, in his official capacity as CHIEF OF ENGINEERS AND COMMANDING GENERAL, U.S. ARMY CORPS OF ENGINEERS; and MICHAEL L. CONNOR, in his official capacity as ASSISTANT SECRETARY OF THE ARMY (CIVIL WORKS), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:23-cv-00020 |
| Defendants. | ) | |

_____

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Atchison v. Collins*, 288 F.3d 177 (5th Cir. 2002) ........................................................21

*BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) .........................................28

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................................................30

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) ..................................................15, 16

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).........................................23

*Georgia v. Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019) ......................16, 18, 19, 20

*Gundy v. United States*, 139 S. Ct. 2116 (2019) ....................................................27, 28

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 2022 WL 2960031 (W.D. La. July 26, 2022) .........................................................................................................29

*Mich. Citizens for an Indep. Press v. Thornburgh*, 1988 WL 90388 (D.D.C. Aug. 17, 1988) ........................................................................................................................30

*Mistretta v. United States*, 488 U.S. 361 (1989).........................................................27

*Nat'l Ass'n. of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) ......................................17

*Pascua Yaqui Tribe v. U.S. EPA*, 557 F. Supp. 3d 949 (D. Ariz. 2021).......................17

*PIU Mgmt., LLC v. Inflatable Zone Inc.*, 2010 WL 681914 (S.D. Tex. Feb. 25, 2010) ..............................................................................................................................15

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ...............................................29

*Rapanos v. United States*, 547 U.S. 715 (2006)..............................................1, 16, 18

*Sackett v. EPA*, 566 U.S. 120 (2012) ..........................................................................17

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ...................................................................................................................... *passim*

*State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175,180 (5th Cir. 1975) ......................15

*Tesfamichael v. Gonzales*, 411 F.3d 169 (5th Cir. 2005) ............................................17

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) ..............................................................................................................................14

*Texas Food Indus. Ass'n v. U.S. Dep't of Agric.*, 842 F. Supp. 254 (W.D. Tex. 1993) ................................................................................................................29

*Texas v. Becerra*, 577 F. Supp. 3d 527 (N.D. Tex. 2021) ............................................28

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ..................................................30

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ...............................17

*United States v. Lauderdale Cnty.*, 914 F.3d 960 (5th Cir. 2019) ..............................17

*VanDerStok v. Garland*, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ..................28, 29

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ......................................................26, 27

*Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F. 3d 411 (5th Cir. 2001) ................24

**Constitutional Provisions & Statutes**

5 U.S.C. § 706(2)(C) .....................................................................................................17

33 U.S.C. § 1251 ................................................................................................20, 21, 22

33 U.S.C. § 1311(a) .........................................................................................................3

33 U.S.C. § 1313(a)(1) ...................................................................................................19

33 U.S.C. § 1362(7) ...............................................................................................1, 3, 17

Administrative Procedure Act.........................................................................................17

Clean Water Act..................................................................................................... *passim*

**Regulations**

88 Fed. Reg. 3004 (Jan. 18, 2023) ........................................................................ *passim*

80 Fed. Reg. 37,054 (June 29, 2015) .............................................................................16

Federal Rule of Civil Procedure 65 ..................................................................................1

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs[1] respectfully move for the entry of a nationwide preliminary injunction prohibiting Defendants from enforcing, implementing, applying, or otherwise giving effect to the *Revised Definition of "Waters of the United States"* ("Rule"), 88 Fed. Reg. 3004 (Jan. 18, 2023) (**Exhibit B**).

## NATURE AND STAGE OF PROCEEDINGS

This is a lawsuit for declaratory judgment and injunctive relief challenging the legality of the Rule. The Rule was published in the Federal Register on January 18, 2023, and is set to take effect on March 20, 2023. Plaintiffs filed their Complaint in this lawsuit on January 18, 2023 (Dkt. 1), and amended their Complaint on February 2, 2023 (Dkt. 12).

## INTRODUCTION

The Rule is a sprawling regulation of immense national importance that defines the extent to which the Environmental Protection Agency and Army Corps of Engineers (the "Agencies") possess regulatory jurisdiction under the Clean Water Act ("CWA"). The Rule purports to clarify the Agencies' definition of "waters of the United States" ("WOTUS") as used in the CWA (*see* 33 U.S.C. § 1362(7)), and as such defines the geographic reach of the CWA. *See Rapanos v. United States*, 547 U.S. 715, 742 (2006) (plurality). But the Rule contradicts the statute it is meant to enforce, allowing assertion of federal jurisdiction

---

[1] "Plaintiffs" are the American Farm Bureau Federation; American Petroleum Institute; American Road and Transportation Builders Association; Associated General Contractors of America; Leading Builders of America; Matagorda County Farm Bureau; National Apartment Association; the National Association of Home Builders of the United States; National Association of REALTORS®; National Cattlemen's Beef Association; National Corn Growers Association; National Mining Association; National Multifamily Housing Council; National Pork Producers Council; National Stone, Sand and Gravel Association; Public Lands Council; Texas Farm Bureau; and U.S. Poultry and Egg Association.

over water and land no matter how remotely connected to a navigable water, if there even is any such connection. The Rule is also hopelessly vague, leaving the regulated community guessing as to whether their lands include WOTUS, and at risk of severe criminal and civil sanctions for making ordinary use of their property. Further, the Rule is an impermissible attempt to resolve an extraordinarily important question of the scope of federal regulatory authority over countless geographic features found in every corner of the Nation. But such major questions must be answered by Congress, not by executive branch agencies. And even if it were otherwise proper for the Agencies, rather than Congress, to define WOTUS, Congress did not provide an intelligible principle for the Agencies to use to reach their definition and therefore the Rule must fail because it is the product of an improper delegation of legislative powers.

Plaintiffs represent virtually every element of the national economy in every part of the country. They, their members, and their members' clients will be irreparably harmed if the Rule goes into effect before their legal challenges are resolved. The Rule makes clear that the Agencies intend to exert CWA jurisdiction over a staggering range of wet features, whether they are large or small; permanent, intermittent, or ephemeral; flowing or stagnant; natural or man-made; interstate or intrastate; and no matter how remote from a physical connection to actual navigable waters, and even if they lack a physical connection at all.

This matters a great deal to Plaintiffs, their members, and their members' clients. Under the CWA, a person may not "discharge" "any pollutant" without a permit issued under Section 402 of the statute, for discharges covered by the National Pollution Discharge Elimination System ("NPDES"), or Section 404, permitting discharges of

dredged or fill material. 33 U.S.C. § 1311(a). The CWA defines "discharge of a pollutant" as the "addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A). "Navigable waters" are defined to mean "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Thus, if a water or land feature falls within the definition of WOTUS, it is within the Agencies' jurisdiction and subject to the CWA's permitting regime.

The consequences of the breathtakingly broad Rule are severe. To start, the permitting process is expensive and imposes significant burdens on individuals and businesses seeking to make productive use of land. The broad scope of land and water features for which permitting will be required under the Rule imposes tremendous costs on the regulated community. Additionally, the CWA imposes significant criminal and civil penalties for violation of its provisions, so if there is any doubt whether a water or land feature is within the Agencies' regulatory jurisdiction, landowners and users will either have to submit to an expensive jurisdictional determination process for features never before thought to fall within the CWA or else forgo the planned use of the land. Further, the Rule requires landowners and users to assess not only their own land, but also vast expanses of land beyond their own holdings, using multiple vaguely defined connections to potentially remote features, to try to determine whether their land is regulated under the CWA. On top of all that, the Agencies have declined to define key terms that are essential to the jurisdictional determinations, leaving landowners and users to guess at what they might mean. The breadth of the Rule and its many ambiguities place the regulated community in an impossible position that warrants a preliminary injunction.

## STATEMENT OF RELEVANT FACTS

### A.    The Rule.

The Rule (at 88 Fed. Reg. 3005-06) interprets WOTUS to include:

[1] traditional navigable waters, the territorial seas, and interstate waters ("paragraph (a)(1) waters"); [2] impoundments of [WOTUS] ("paragraph (a)(2) waters"); [3] tributaries to [paragraph (a)(1) waters] or paragraph (a)(2) impoundments when the tributaries meet either the relatively permanent standard or the significant nexus standard ("jurisdictional tributaries"); [4] wetlands adjacent to paragraph (a)(1) waters, wetlands adjacent to . . . paragraph (a)(2) impoundments, wetlands adjacent to tributaries that meet the relatively permanent standard, and wetlands adjacent to paragraph (a)(2) impoundments or jurisdictional tributaries when the wetlands meet the significant nexus standard ("jurisdictional adjacent wetlands"); and [5] intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard ("other intrastate jurisdictional waters" or "paragraph (a)(5) waters").

The Agencies define the "relatively permanent standard" to mean "waters that are relatively permanent, standing or continuously flowing waters" connected to paragraph (a)(1) traditional navigable waters, interstate waters, and the territorial seas, "and waters with a continuous surface connection to such relatively permanent waters or to paragraph (a)(1) waters." 88 Fed. Reg. 3038. The Rule does not define "relatively permanent." And while the Rule states that there "must be a continuous surface connection on the landscape for waters" to meet the "relatively permanent" standard, the continuous surface connection need not be "a constant hydrologic connection." *Id.* at 3102.

The Agencies define the "significant nexus standard" as "waters that, either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial

seas, or interstate waters." 88 Fed. Reg. 3006. The Rule does not clearly define what it means to be "similarly situated," what constitutes "in the region," what is the standard to measure a "significant affect," or what "chemical, physical, or biological integrity" means.

The Agencies interpret "similarly situated" to mean "waters are providing common, or similar, functions for paragraph (a)(1) waters such that it is reasonable to consider their effects together." 88 Fed. Reg. 3127. Plaintiffs can only guess what "functions" are sufficiently "similar" to meet this "reasonableness" standard.

The Agencies interpret "in the region" to mean that the feature in question "lie[s] within the catchment area of the tributary of interest." 88 Fed. Reg. 3088. That leaves Plaintiffs, their members, and their clients wondering if a low spot in a field is a WOTUS, and would require them to look not just at their own land, but at any feature that might be "similar" located anywhere in a potentially vast and ill-defined "catchment" area.

The Rule vaguely defines "significantly affect" as a "material influence on the chemical, physical, or biological integrity" of a paragraph (a)(1) water. 88 Fed. Reg. 3143. To apply this standard, the Agencies look to vague factors like "distance from a paragraph (a)(1) water," "hydrologic factors," the waters that have been determined to be "similarly situated," and "climatological variables." *Id*. This opaque definition provides no guidance to Plaintiffs, their members, and their clients to determine if their property contains WOTUS. And these undefined concepts ensure no landowner can ever look at its property and know whether the land contains a WOTUS until the Agencies reveal the answer.

The Agencies provide examples of what constitutes an "impoundment" of WOTUS, but they do not define the term. 88 Fed. Reg. 3075. And they broadly assert jurisdiction

over "impoundments created by impounding one of the [WOTUS] that was jurisdictional under this rule's definition at the time the impoundment was created"—regardless of whether the impounded water remains jurisdictional—and "impoundments of waters that at the time of assessment meet the definition of [WOTUS] under this [R]ule . . . regardless of the water's jurisdictional status at the time the impoundment was created." *Id.*

A "tributary" can include "natural, human-altered, or human-made water bodies that flow directly or indirectly through another water or waters to a traditional navigable water, the territorial seas, or an interstate water." 88 Fed. Reg. 3083. That flow can be through "non-jurisdictional features, such as a ditch," through a feature "that flows infrequently," need not "have a surface flowpath all the way down to the paragraph (a)(1) water," and may be interrupted by "natural and artificial breaks" that can involve (invisible) "subsurface flow." *Id.* at 3084.

For "adjacent wetlands," "adjacent" is defined as "bordering, contiguous, or neighboring." 88 Fed. Reg. 3089. Those terms, including the vague "neighboring," are not defined in the Rule except to state that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like are 'adjacent wetlands.'" *Id.*

The Rule allows for case-specific assertions of jurisdiction over a broad category of "waters." 88 Fed. Reg. 3024. And the "paragraph (a)(5) waters" category encompasses intrastate, non-navigable features that were previously considered to be "isolated" and thus not within the CWA's jurisdiction. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167, 171 (2001) ("*SWANCC*").

**B.     The Rule's impact on the regulated community.**

If the Rule takes effect, it will expose landowners and users to a vague and burdensome legal regime that does not guide the Agencies in the exercise of their discretion and threatens landowners and users with substantial criminal and civil liability for the ordinary use of their land. Briggs Decl. ¶ 14.[2] Similar to the 2015 Rule that was enjoined as unlawful, the Rule dramatically expands the scope of CWA jurisdiction as it applies to land in use for many common and essential activities across the country, such as farming, ranching, mining, homebuilding, and infrastructure construction. *Id.* ¶ 33. Instead of providing clarity to the regulated community, the Rule will make it extremely difficult for anyone to determine whether a feature on land is subject to CWA permitting requirements. *Id.*; Hart Decl. ¶ 6.

**1.     The Rule's expansiveness and vagueness create harmful uncertainty for individuals and businesses across the Nation.**

The Rule leaves landowners and businesses to guess whether a feature on their property will be considered a WOTUS by the Agencies, because so many key components of the Rule that go directly to the jurisdictional determination are unclear. Briggs Decl. ¶¶ 44-52. The use of vague terms to determine whether a feature is within the Agencies' jurisdiction, such as "similarly situated" and "material influence," is especially problematic because of those terms' potential expansiveness. *Id.* ¶ 44; Goldstein Decl. ¶ 12; Rorick Decl. ¶ 12. Additionally, the Rule permits the Agencies to make case-specific

---

[2] Declarations of Plaintiffs and their members in support of this action are attached as **Exhibit A** to Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (Dkt. 12) and are re-attached to this motion for convenience.

determinations, which may vary from field office to field office, using remote desktop technology unavailable to most farmers and ranchers. Briggs Decl. ¶ 48.

The uncertainty created by the Rule's vague terms will deter and delay necessary efforts to repair, replace, and upgrade public infrastructure and increase construction costs. Pilconis Decl. ¶ 20. It will also reduce levels of investment in infrastructure. *Id.* ¶ 22. Because of the Rule's vague and case-specific standards, Plaintiffs, their members, and their clients will not be able to make informed decisions about operations, finances, and logistics of a project that is potentially near a WOTUS. Riggs Decl. ¶ 8.

### 2. The Rule will require the regulated community to conduct costly and time-consuming jurisdictional investigations.

The Rule imposes concrete, significant costs on the regulated community. Simply, jurisdictional determinations and CWA permits are very expensive to obtain, often costing hundreds of thousands of dollars. Briggs Decl. ¶ 51; Coyner Decl. ¶ 14; Goldstein Decl. ¶ 11; Pilconis Decl. ¶ 25; Ward Decl. ¶ 12. Obtaining jurisdictional determinations and permits from the Agencies requires paying consultants and engineers, and incurring mitigation and other compliance costs. Briggs Decl. ¶ 51. And jurisdictional determinations take months to years, during which landowners are in limbo. *Id.*; Coyner Decl. ¶ 14; Pilconis Decl. ¶ 25. Given the vagueness of the Rule, a property owner that undertakes its own analysis of WOTUS runs a real risk that the Agencies may later challenge its conclusions, exposing the landowner to additional costs and the threat of civil fines and criminal penalties. Rorick Decl. ¶ 13.

Small business owners will be forced to abandon use of their land or its further development rather than incur the high costs of investigating whether WOTUS are present. Briggs Decl. ¶ 51; Reed Decl. ¶ 14. Companies that mine the aggregates essential for construction will choose not to expand their facilities or open new ones. Coyner Decl. ¶ 13. Likewise, companies will be more likely to forgo oil and natural gas development in some areas out of concern that the Agencies may deem a feature to be a WOTUS. Rorick. Decl. ¶ 13. Companies mining metals, coal, and industrial and agricultural minerals will need to change their operations, which could result in stranded mineral reserves and lost production. Sweeney Decl. ¶ 10.

The impacts of the Rule will be felt nationwide. For instance, northern New England often sees developments that involve repurposing textile and paper mills. Bennett Decl. ¶¶ 5-6. Those sites typically include impoundments and historically culverted, ditched, or buried stream channels that might now be jurisdictional under the Rule and will be subject to costly and time-consuming jurisdictional determinations. *Id.* ¶ 6. Coal mines from North Dakota to Texas will be harmed because previously unregulated features on their land, such as ephemeral streams and prairie potholes, may now be jurisdictional. McGrew Decl. ¶¶ 11-12. Additionally, farmers grazing livestock on federal land, primarily in the West and in Texas, will face uncertainty whether they need to change their practices because there are features on that land that may now be jurisdictional. Glover Decl. ¶ 6.

### 3.   The Rule's impacts on farmers and ranchers.

Because the Rule defines as jurisdictional countless sometimes-wet landscape features that are ubiquitous in and around farmland, many common features of farm and

ranch lands will be subject to the Agencies' permitting requirements. Briggs Decl. ¶¶ 34-35. "America's farm and ranch lands are an intricate maze of ditches, ponds, wetlands, 'ephemeral' drainages, and other water features, that may be considered jurisdictional under the Rule." *Id.* ¶ 35. For instance, considering drains, ditches, stock ponds, and low spots on farmlands and pastures to be jurisdictional means that the Agencies might require permits for typical activities on those lands such as moving dirt, applying products to the land, and plowing, planting, and building fences near ephemeral streams. *Id.* ¶¶ 42-43; Haag Decl. ¶ 6.[3]

Many family and small business farms cannot afford the tens of thousands of dollars of costs for federal permitting for ordinary farming activities. Briggs Decl. ¶ 43; Reed Decl. ¶ 14. But even those who can afford permits will still have to wait months or more to obtain the necessary permits to conduct such typical activities as plowing, planting, and fertilizing their farmland. Briggs Decl. ¶ 43.

The Rule creates more uncertainty for farmers about whether features on their land will be declared jurisdictional than they faced under the Agencies' 2008 Guidance or the 2015 Rule interpreting WOTUS. Briggs Decl. ¶ 44. This is a product of the numerous undefined and amorphous terms, described in the previous section, that leave the regulated community guessing as to what is jurisdictional. To be sure, the Agencies regard this as a

---

[3] The Rule's exclusion of "ditches" applies only to ditches "excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water," 88 Fed. Reg. 3103—rendering the exclusion useless to a farmer who lacks knowledge of the conditions of the land when the ditch was excavated, faces uncertainty over whether only "dry land" is drained, and cannot guess what the Agencies mean by a "relatively permanent flow."

positive feature of the Rule, touting that it will permit complex case-by-case determinations. 88 Fed. Reg. 3047. But those case-by-case determinations, which the Agencies admit will increase as a result of the new Rule, *id* at 3047 n.65, are costly and will require landowners to take their land out of use.

As one example, Jim Chilton, the owner of Chilton Ranch, states that his ranch has a dry wash[4] feature that is twenty-four inches wide and was not previously understood to be jurisdictional, but under the Rule the dry wash might meet the definition of a "tributary." That dry wash leads to a larger dry wash, which leads to an ephemeral or intermittent river called the Santa Cruz River, which leads to the Gila River, which leads to the Colorado River 265 miles away from the ranch. Chilton Decl. ¶ 4. The possibility that the dry wash is jurisdictional under the Rule creates operational uncertainty at the ranch. *Id.* ¶ 6. Additionally, under the Rule, Chilton faces renewed uncertainty about whether discharges from point sources like farm equipment into ditches may require changes to his ranching practices. *Id.* ¶¶ 6-7. Chilton has found it necessary to abandon projects in the past rather than go through the expensive and time-consuming permitting process, and if the Rule becomes effective he will need to take action to identify features that may be covered under the Rule. *Id.* ¶¶ 5, 7.

Robert Reed leases 3,000 acres that he farms in Matagorda County, Texas. Reed Decl. ¶¶ 2, 5. He raises rice and sorghum and grazes cattle. *Id.* ¶ 6. The land features a gradual slope and has naturally occurring ephemeral drains that carry water only after it

---

[4] A dry wash is the dry bed of an ephemeral or intermittent stream that flows only after a heavy rainfall.

rains. *Id.* ¶¶ 9, 10. Some of the drains have been improved to ditches to aid the flow of water away from the fields. *Id.* ¶ 10. The ditches carry water only after moderate or heavy rains or when there is runoff from the rice fields and they lead to a creek, then to Matagorda Bay, then to the Gulf of Mexico. *Id.* ¶ 10. Under the Rule, the Agencies may consider the ditches to be "tributaries" or "other waters" subject to regulatory jurisdiction. *Id.* ¶ 11. The ditches have never been considered WOTUS previously and no regulator has determined that they have a significant nexus to downstream navigable waters. *Id.* ¶ 12.

### 4. The Rule's impacts on oil and gas companies.

Of course, the impacts of the Rule are not limited to farmers and ranchers. For instance, companies in the oil and natural gas sector will be faced with the same uncertainty over the jurisdictional reach of the Rule. Rorick Decl. ¶ 12. As a result, those companies will need to expend considerable resources to determine whether waters or dry landscape features impacted by oil and gas development, transportation, or related activities will be subject to the Rule. And the Rule's vagueness and ambiguity will cause companies to forego oil and natural gas development out of concern that the Agencies may later deem certain areas jurisdictional. *Id.* ¶ 13.

### 5. The Rule's impact on mining.

The mining industry will also be hard-hit by the Rule. For instance, the Freedom, Falkirk, and Coyote Creek Mines in North Dakota contain isolated prairie potholes that might be within the Rule. McGrew Decl. ¶ 10. Other mines, such as the Sabine Mine in Marshall County, Texas, potentially contain thousands of linear feet of ephemeral streams within their permitted mine areas. *Id.* ¶ 11. The operator of those mines, North American

Coal Company, will be required to retain and pay environmental consultants to conduct jurisdictional determinations of such features that were previously unregulated. *Id.* ¶ 12.

### 6.    The Rule's impact on construction.

In the face of a national shortfall of apartments, construction firms that build multifamily housing will be saddled with construction delays and rising development costs due to the increased likelihood that a jurisdictional determination will be required. Chetti Decl. ¶¶ 12, 14. This could exacerbate critical housing shortages. *Id.* ¶ 14. The uncertainty surrounding how vague provisions of the Rule will apply to features in and around their land will affect home builders and could substantially increase the cost of homes. Gear Decl. ¶¶ 2, 3, 9.

The greater delays that will be associated with jurisdictional determinations under the Rule will grow the backlog of environmentally beneficial projects, such as those repurposing old sites to new and beneficial uses. Bennett Decl. ¶ 8. The construction industry will face similar challenges as a result of the Rule's new significant nexus test. Pilconis Decl. ¶ 18.

And such delays will be acutely felt by the transportation construction industry, which will need many costly and time-consuming determinations about roadside ditches and other features commonly in the areas where highway and other transit construction is taking place. Goldstein Decl. ¶¶ 8, 12. Each ditch will need to be evaluated separately to determine the extent of its reach. Pilconis Decl. ¶ 18. Such delays will likely cause transportation projects to be either put on hold entirely or else scaled back. Goldstein Decl. ¶ 9. Additionally, the delays and costs caused by the increase in jurisdictional investigations

and determinations under the Rule will divert resources from ditch maintenance activities, which poses a safety threat because man-made ditches perform specific functions in safely moving water away from the roadways. Goldstein Decl. ¶¶ 8, 10.

Companies that produce aggregates—crushed stone and sand and gravel that is used in virtually all home, building, road, bridge, and public works construction projects—will also be acutely affected by the Rule. Coyner Decl. ¶ 3. By their nature, these operations need to be local to minimize transportation costs and impacts associated with production of heavy materials. *Id*. The operations also take place on very large properties located near water, so there is a high likelihood that jurisdictional features under the Rule such as dry stream beds will be present at the aggregate manufacturers' facilities. *Id.* ¶ 10. Aggregate companies invest in land for future operations based on the quality of reserves and proximity to anticipated population growth, and expanded jurisdiction under the Rule impacts the companies' viability. *Id.* ¶ 14.

### ISSUE & STANDARD OF DECISION

The issue to be decided is whether the Court should enter a nationwide preliminary injunction of the Rule. "To be entitled to a preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). These factors do not have "a fixed quantitative value" and instead are applied on a "sliding-scale" in which

"the intensity of each" is taken into account. *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175,180 (5th Cir. 1975); *see also PIU Mgmt., LLC v. Inflatable Zone Inc.*, 2010 WL 681914, at *7 (S.D. Tex. Feb. 25, 2010).

## ARGUMENT

Each of the four preliminary injunction factors is readily satisfied in this case and this Court should enjoin the Rule nationwide. Plaintiffs are likely to prevail on their challenge because the Rule violates the CWA, governing precedent, and the Due Process and Commerce Clauses, and is an improper attempt to answer a major question pursuant to an impermissible delegation of legislative powers. Further tipping the scale in favor of an injunction is the tremendous harm the Rule imposes on the regulated community in the form of costs of compliance, which they can never recover from the Agencies, and the profound chilling effect on uses of their land described above. By contrast, on the other side of the scale, the Agencies will not be harmed by an injunction requiring that they maintain the status quo. Finally, the public interest in (1) the proper enforcement of the limits the Agencies' authority and (2) respect for States' traditional authority to regulate land and water use within their borders strongly supports the issuance of the relief that Plaintiffs seek.

### A.     **Plaintiffs are likely to prevail on the merits of their claims**.

#### 1.     **The Agencies' statutory interpretation is not entitled to deference**.

Throughout their explanation of the Rule, the Agencies contend that their latest reinterpretation of WOTUS is entitled to deference. Not so. The Fifth Circuit recently considered an agency interpretation of an ambiguous statute in *Cargill v. Garland*, 57 F.4th

447 (5th Cir. 2023) (en banc). There, plaintiff challenged a Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") rule that included non-mechanical bump stock devices in the definition of "machinegun" in the National Firearms Act. While the court found that the rule was invalid because it was contrary to an unambiguous statute, it also explained that if the statute were ambiguous, ATF's rule would not be entitled to deference because the rule interprets a statute that imposes criminal penalties. *Id*. at 467-68. Further, the rule of lenity requires that ambiguity in criminal statutes must be resolved against application of criminal penalties. *Id*. Additionally, the challenged rule deviated from ATF's prior interpretation, and deference does not apply when "the Government has construed the same statute in two, inconsistent ways at different points in time." *Id*. at 469.

*Cargill*'s import is clear. The CWA imposes criminal penalties, so the Agencies' interpretation of WOTUS is not entitled to deference; and the rule of lenity requires that WOTUS be construed narrowly, not expansively as the Agencies claim. Further, the Agencies have interpreted WOTUS inconsistently, most recently in the 2020 Navigable Waters Protection Rule, which excluded from federal authority many water and land features that would be jurisdictional under the Rule (*see* 88 Fed. Reg. 3063-64); and before that in the 2015 Rule (*Clean Water Rule: Definition of "Waters of the United States"*, 80 Fed. Reg. 37,054 (June 29, 2015)), which applied quite different tests from the 2020 or current Rule to arrive at an expansive definition of WOTUS, including specific distance criteria. The Agencies are owed no deference to their latest Rule when they have for decades adopted a series radically different interpretations of WOTUS, each of which has been struck down as inconsistent with the statute (*see SWANCC*; *Rapanos*; *Georgia v.*

*Wheeler*, 418 F. Supp. 3d 1336 (S.D. Ga. 2019); *Pascua Yaqui Tribe v. U.S. EPA*, 557 F. Supp. 3d 949 (D. Ariz. 2021)), and when their views of judicial authority to police their WOTUS interpretations have similarly been held to be flatly wrong. *See Sackett v. EPA*, 566 U.S. 120 (2012); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016); *Nat'l Ass'n. of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018). In short, the Agencies' approach to WOTUS has been an abject failure in every respect from the start, and they have forfeited any claim to deference.

### 2. The Rule is contrary to the CWA.

An agency regulation that is inconsistent with the enabling statute violates the Administrative Procedure Act because it is an act in excess of the agency's statutory authority. 5 U.S.C. § 706(2)(C). Statutory interpretation begins with the text. *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019). "It is axiomatic that courts should strive to give operative meaning to every word in a statute." *Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005).

### a. The Rule ignores the "navigable waters" requirement of the CWA.

The CWA grants the Agencies jurisdiction over "navigable waters," which the statute defines as "the waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court made clear that "Congress' separate definitional use of the phrase 'waters of the United States' [does not] constitute[] a basis for reading the term 'navigable waters' out of the statute." *SWANCC*, 531 U.S. at 172. Although "the word 'navigable' in the statute" may have "limited import," it does not have "no effect whatever." *Id.* at 172-73 (citing

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985)). Instead, the phrase "navigable waters" demonstrates what "Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 168. In his concurrence in *Rapanos*, Justice Kennedy explained that if "navigable" is to have any meaning, the CWA cannot be understood to "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." 547 U.S. at 778; *see also id.* at 733-34 (plurality). The Rule's inclusion in WOTUS of features with only a "remote and insubstantial" connection to navigable waters exceeds the Agencies' authority under the CWA and runs headlong into five Justices' views in *Rapanos*. *See* 88 Fed. Reg. 3072.

One example: the Rule asserts federal jurisdiction over all "interstate waters, including interstate wetlands"—"all rivers, lakes, and other waters that flow across, or form a part of, State boundaries." 88 Fed. Reg. at 3072. Therefore, a water or wetland is a WOTUS if it crosses a state line, no matter how small or isolated it might be and regardless of whether the water is navigable. As a district court held in striking down the 2015 Rule, the "Agencies' assertion of jurisdiction over all interstate waters is not a permissible construction of the CWA because they assert jurisdiction over waters that are not navigable-in-fact and otherwise have no significant nexus to any other navigable-in-fact water." *Georgia v. Wheeler*, 418 F. Supp. 3d at 1359. As that court explained, "[u]nder such a broad definition, a mere trickle, an isolated pond, or some other small, non-navigable body of water would be under federal jurisdiction simply because it crosses a

state line or lies along a state border," which would encompass the types of isolated ponds that the Court declared not to be jurisdictional in *SWANCC*. *Id.* And as the *Wheeler* court recognized (and as remains the case, *see* 88 Fed. Reg. 3142), a categorical exercise of jurisdiction over interstate waters also brings within federal jurisdiction the tributaries to such waters, no matter how remote they are from a traditionally navigable water. *Id.*

The Agencies justify the categorical inclusion of interstate waters by claiming that "navigable waters" means "the waters of the United States," and interstate waters are waters of the "several States" under the Constitution. 88 Fed. Reg. 3073 (citing U.S. Const., sec. 8). That is a non-sequitur; the Framers surely were not describing the exercise of broad federal regulatory jurisdiction over "navigable waters." The Agencies also rely on Section 303(a) of the CWA, which states that "any water quality standard applicable to interstate waters which was adopted by any State and submitted to" the EPA will remain in effect after the effective date of the CWA. 33 U.S.C. § 1313(a)(1). That provision does not mean that interstate waters are categorically within the CWA, only that certain state rules were grandfathered and were to remain effective regardless of whether the waters would be within federal jurisdiction under the CWA.

The Agencies admit that a prior version of the Water Pollution Act of 1948 made pollution of "interstate or navigable" waters the subject of abatement. 88 Fed. Reg. 3073. Congress' decision to remove "interstate" from categorical jurisdiction and retaining "navigable" in enacting the CWA must be given its plain effect.

**b.** **The Rule reads Section 101(b)'s protection of traditional statute authority over land and water use out of the statute**.

In the CWA, Congress stated a purpose to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use … of land and water resources, and to consult with the [EPA] in the exercise of [its] authority under this chapter." 33 U.S.C. § 1251(b). The Rule cannot be reconciled with that purpose. By imposing what is in effect a broad national zoning ordinance that sweeps countless land features into federal regulatory jurisdiction, the Agencies have usurped basic state powers that Congress sought to protect.

In *SWANCC*, the Court recognized that Congress did not manifest a clear intent for federal regulation to extend to the limits of the Agencies' constitutional authority. 531 U.S. at 172-73. A clear intent was necessary because an interpretation of WOTUS to be as broad as the federal government's Commerce Clause authority would "alter[] the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 173. Like the Migratory Bird Rule in *SWANCC*, the Rule extends federal regulatory authority to land features, such as naturally occurring drainage channels on farms or man-made ditches alongside highways, that may be hundreds of miles from a traditionally navigable water. This is the sort of "vast expansion of jurisdiction over waters and land traditionally within the states' regulatory authority" that is not authorized by the CWA. *Georgia v. Wheeler*, 418 F. Supp. 3d at 1370, 1372.

Consistent with *SWANCC* and as embodied in Section 101(b) of the CWA, the Agencies must honor the States' authority over their land and water resources. By sweeping

into WOTUS countless features that are nowhere near navigable waters, the Rule eviscerates the States' traditional authority by making the Agencies the arbiter, through CWA permitting, of whether innumerable farming, ranching, mining, transportation, and construction practices and projects may proceed.

The Agencies acknowledge the statutory purpose in Section 101(b), but they discount it, "subordinat[ing]" it to the "overarching objective" in Section 101(a) of "restoring and maintaining the chemical, physical, and biological integrity of the nation's waters." 88 Fed. Reg. 3043-44. The Agencies assert that "there is no indication in any text of the statute that Congress established section 101(b) as the lynchpin of defining the scope of 'waters of the United States.'" *Id.* at 3044. The Agencies continue that the Rule serves the "congressional policy" of preserving state authority by limiting the definition of WOTUS to "those waters that significantly affect the indisputable Federal interest in the protection of the paragraph (a)(1) waters." *Id.* at 3043.

The Agencies' interpretation of the CWA to have one objective in Section 101(a) and then several subordinate "congressional policies" in other subsections of Section 101 ignores the statutory text. As a matter of basic statutory interpretation, Sections 101(a) and 101(b) must be read together. *Atchison v. Collins*, 288 F.3d 177, 181 (5th Cir. 2002).

Section 101(a) states that "[t]he objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that objective, Congress enumerated 7 "national goals" and "policies," such as "the discharge of pollutants into the navigable waters be eliminated by 1985"; "the discharge of toxic pollutants in toxic amounts be prohibited"; "Federal

financial assistance be provided to construct publicly owned waste treatment works"; and "major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters." *Id.*

Before stating any specific powers to achieve those goals, Congress provided in Section 101(b) that it intended to preserve and protect traditional state authority over land and water use. 33 U.S.C. § 1251(b). Thus, while the Agencies state that the CWA is designed to address the pollution-control objective set forth in Section 101(a) "through a 'comprehensive' Federal program of pollution control," 88 Fed. Reg. 3044, they ignore the very next provision of the CWA in which Congress placed a limit on the scope of federal powers: the "overarching objective" of Section 101(a) must be carried out in a way that "preserve[s]" and "protect[s]" the "rights of States" to "plan the development and use … of land and water resources." 33 U.S.C. § 1251(b). There is no textual support for subordinating the specific and clear intent of Section 101(b) to preserve state authority over land and water to the general objectives set out in Section 101(a).

The Agencies' myopic focus on Section 101(a) and their attempt to subordinate Section 101(b) misunderstands the statutory structure. And a claim that the Rule does not intrude upon traditional state authority over land and water use is fanciful. *See SWANCC*, 531 U.S. at 174 ("Permitting respondents to claim federal jurisdiction over ponds and mudflats … would result in a significant impingement of the States' traditional and primary power over land and water use" because "'regulation of land use [is] a function traditionally performed by local governments'").

3.      **The Rule violates the Constitution**.

a.      **The Rule is an improper exercise of authority under the Commerce Clause**.

The Supreme Court in *SWANCC* rejected the Agencies' claim to regulate water to the widest limits of Congress's Commerce Clause power, pointing out that the basis of the CWA was not the broadest "affects commerce" head of the commerce power but instead Congress's authority over water as a channel of interstate commerce. 531 U.S. at 172-73. Now, the Agencies claim to be regulating WOTUS to the full extent of Commerce Clause authority to regulate channels of interstate commerce. 88 Fed. Reg. 3045. But the exercise of Commerce Clause authority under the CWA has limits, as *SWANCC* held when it refused to allow the Agencies to "readjust the federal-state balance" to regulate land and water use. 531 U.S. at 174. The new Rule violates that limit and also the inherent constraint in the "channels" authority addressing navigability. The Agencies fail to tie their Rule to protecting navigability, revealing this new reliance on the "channels" authority as a ruse.

b.      **The Rule is unconstitutionally vague**.

"A fundamental principle in our legal system is that laws … must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law that is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Id*. A law is unconstitutionally vague if it "(1) fails to provide those targeted … a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it

allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F. 3d 411, 421 (5th Cir. 2001). The Rule fails on both of these grounds.

The Rule is replete with terms that define WOTUS but leave the regulated community guessing at their meaning. The Rule also gives nearly unfettered discretion to the Agencies to make fact-intensive, case-by-case jurisdictional determinations by applying several broad "factors" to determine whether a water or land feature significantly affects a "function" of a jurisdictional water. 88 Fed. Reg. 3143. Vague terms that allow the Agencies to "know it when they see it" but deprive the regulated community of fair notice are all the more constitutionally repugnant because the CWA is a criminal statute.

*First*, the Rule fails to provide fair notice to the regulated community of what will be considered a WOTUS because the significant nexus test in the Rule relies on a series of hopelessly vague terms. As Plaintiffs' declarants repeatedly state, the members of the regulated community are left to guess whether a feature on their property will be considered jurisdictional because of the vagueness of key terms such as "material influence," "in the region," and "similarly situated". *E.g.*, Briggs Decl. ¶ 44; Goldstein Decl. ¶ 12; Rorick Decl. ¶ 12. The Rule provides that whether a feature is "similarly situated" to others and "materially influences" a jurisdictional water depends on a number of indeterminate "factors" and "functions" that the Agencies, in their complete discretion, will weigh on a case-by-case basis. 88 Fed. Reg. 3067. That does not provide the needed notice.

*Second*, the Rule is essentially standardless, allowing arbitrary and discriminatory enforcement by the Agencies. For instance, the Agencies will use the Rule's significant nexus standard to determine if a water is within their regulatory jurisdiction by examining

24

whether the water "alone, or in combination with other similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of the waters identified in paragraph (a)(1) of this rule." 88 Fed. Reg. 3119. To determine whether there is the requisite "significant effect," the Agencies will determine whether there is "a material influence on the chemical, physical, or biological integrity" of a paragraph (a)(1) water. *Id*.

To determine whether there is a "material influence," "waters, including wetlands, are evaluated either alone or in combination with other similarly situated waters in the region based on the functions the evaluated waters perform." 88 Fed. Reg. 3119.  Whether the water is performing the required functions, which include standardless concepts such as "contribution of flow" and "transport of materials," either by itself or together with "similar" features, wherever or whatever they may be, is determined by examining certain "factors." *Id.* at 3120. The factors the Agencies will consider are "site-specific conditions that influence the strength of the functions that lakes, ponds, and wetlands provide to paragraph (a)(1) waters." *Id*. They include distance from a paragraph (a)(1) water, size, hydrologic factors, landscape, and climate variables. *Id*.

In sum, the significant nexus test—a cornerstone of the Rule—requires a rudderless case-specific examination of waters to determine if they significantly affect a jurisdictional water, which means that they must materially affect the jurisdictional water, which in turn requires that the water, alone or aggregated with other vaguely defined similarly situated waters, performs broad functions, to be determined by an analysis of amorphous factors that depend on the particular site. And absent from this discussion is any indication what "score" a water must receive to be considered jurisdictional under the test. In other words,

the Agencies can choose the similarly situated features, or not, and measure the factors, which the Agencies get to pick and weigh without any defined standards. For a Rule that gives rise to substantial criminal and civil penalties, that is not constitutionally permissible.

**4.     The Rule violates the major questions doctrine and is the product of an improper delegation of legislative powers**.

The definition of WOTUS determines federal regulatory jurisdiction over countless features in every corner of the Nation. Plaintiffs' declarants illustrate the dramatic breadth of the effects of that definition on farms, ranches, many types of industry, construction, and infrastructure. An agency, however, is not permitted to make such major policy decisions through rulemaking. Rather, that is the job of Congress. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022). There, the Supreme Court explained that agencies are not permitted to exercise regulatory power "over a significant portion of the American economy" or "make a 'radical or fundamental change' to a statutory scheme" through rulemaking without clear authorization by Congress. *Id*. Instead, the Court "presume[s] that 'Congress intends to make major policy decisions itself, and not leave those decisions to agencies." *Id*. at 2609. Therefore, "both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *Id*.

The definition of WOTUS involves regulation of a significant portion of the American land mass and economy and substantially changes the scope of the CWA. The Agencies claim that Congress authorized them to define WOTUS by providing an ambiguous definition of the term and generally authorizing the EPA Administrator to

promulgate rules to effectuate the statute. But that vague grant of general authority to enforce the CWA is not the type of "clear congressional authorization" required to allow an executive agency to answer a major question. *See West Virginia*, 142 S. Ct. at 2614-15.

And if Congress did authorize the Agencies to answer the major question of the scope of their own jurisdiction under the CWA, that authorization is an unconstitutional delegation of legislative powers. For Congress to permissibly delegate its exclusive legislative power, it must "'lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Mistretta v. United States*, 488 U.S. 361, 372 (1989). As Justice Gorsuch observed, "while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code. That 'is delegation running riot.'" *Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch, J., dissenting) (quoting *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935) (Cardozo, J., concurring)).

The CWA contains no such intelligible principle. Indeed, the radical shifts among the Agencies' successive interpretations of WOTUS in the 2015 Rule, the NWPR, and the current Rule evidence the lack of intelligible principles to guide the Agencies' rulemaking. As Justice Gorsuch explained, "[t]he framers knew" that "the job of keeping the legislative power confined to the legislative branch couldn't be trusted to self-policing by Congress; often enough, legislators will face rational incentives to pass problems to the executive branch." *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting). Meaningful judicial enforcement of the nondelegation doctrine is thus needed to "respect[] the people's

sovereign choice to vest the legislative power in Congress alone. And it's about safeguarding a structure designed to protect [the people's] liberties, minority rights, fair notice, and the rule of law." *Id*. The court should invalidate the Rule because Congress has not adequately delegated legislative power to the Agencies to define WOTUS.

> **B.**     **Immediate enforcement of the Rule will cause severe and irreparable harm to the regulated community**.

If the Rule goes into effect, the regulated community will face a choice: seek costly jurisdictional determinations, risk fines and criminal charges for noncompliance, or forgo the use of land. Each choice results in irreparable harm to Plaintiffs' members.

*First*, "[i]n the Fifth Circuit, it is 'well-established that an injury is irreparable" if "it cannot be undone through monetary remedies.'" *VanDerStok v. Garland*, 2022 WL 4809376, at *3 (N.D. Tex. Oct. 1, 2022) (quoting *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012)). And "'a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs,' … 'because federal agencies generally enjoy sovereign immunity for any monetary damages.'" *Texas v. Becerra*, 577 F. Supp. 3d 527, 556 (N.D. Tex. 2021) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) and *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)). A regulation creates irreparable harm when it "places an immediate and irreversible imprint" on the regulated community in the form of compliance costs and diversion of resources. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Therefore, "injunctive relief is justified where a regulated entity can never recover its compliance costs." *Becerra*, 577 F. Supp. 3d at 556; *see also VanDerStok*, 2022 WL

4809376, at *3 ("Where costs are nonrecoverable because the government-defendant enjoys sovereign immunity from monetary damages … irreparable harm is generally satisfied."). Here, sovereign immunity assures that the massive compliance costs the Rule imposes on Plaintiffs' members can never be recovered.

*Second*, the chilling effect on a party's conduct from "the threat of imprisonment and civil penalties" is sufficient to establish irreparable harm. *VanDerStok*, 2022 WL 4809376, at *5. The "Hobson's choice" between incurring costs of complying with a new regulation and violating the law then facing civil and criminal penalties is an irreparable harm. *Id*. As discussed, the regulated community will inevitably forgo projects, developments, and land use in order to avoid possible civil and criminal penalties.

*Third*, agency action such as the Rule that exceeds its authority granted by Congress imposes an irreparable harm on the regulated community. *See Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 2022 WL 2960031, at *13 (W.D. La. July 26, 2022).

## C. The balance of harms and public interest favor an injunction.

On the other hand, there is little counseling against a nationwide preliminary injunction. "The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.'" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Additionally, "enforcing the APA strictly [will] better serve the public interest." *Texas Food Indus. Ass'n v. U.S. Dep't of Agric.*, 842 F. Supp. 254, 261 (W.D. Tex. 1993). Because "[t]he general public has an interest in seeing that laws are administered reasonably, in accordance with law and not

arbitrarily," these considerations favor a preliminary injunction in this case. *Mich. Citizens for an Indep. Press v. Thornburgh*, 1988 WL 90388, at *7 (D.D.C. Aug. 17, 1988).

### D. The injunction should be nationwide in scope.

This Court should enter a nationwide injunction. Plaintiffs have members in every State, and only a nationwide injunction can spare them from harm caused by the Rule. A patchwork regulatory landscape of the sort that resulted from the challenges to the 2015 Rule, which was enjoined in half the country, would leave many of Plaintiffs' members subject to an unlawful Rule that interferes with their businesses and use of their land.

Anyway, "the scope of injunctive relief is dictated by the extent of the violation established" rather than the "geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This Court's judicial "power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction, " such as when a nationwide rule carries "vast economic and political significance." *Texas v. United States*, 809 F.3d 134, 188, 217 (5th Cir. 2015). Here, the Rule is national in scope, with great effect on the economy as well as federal-state relations. As Plaintiffs' declarations show, the Rule affects land use from repurposing textile mills in New England to coal mines in South Dakota to farmers in this district. National regulations should not apply differently depending on the happenstance of location.

### CONCLUSION

For the foregoing reasons, this Court should preliminarily enjoin the Rule nationwide while the merits of Plaintiffs' challenge are resolved.

Dated:  February 7, 2023

Respectfully submitted,

*/s/ Kevin S. Ranlett*
_____

Kevin S. Ranlett
Texas Bar No. 24084922
SDTX No. 1124632
James B. Danford, Jr.
Texas Bar No. 24105775
SDTX No. 3150442
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, TX 77004
Tel:  713-238-2700
Email: kranlett@mayerbrown.com
Email: jdanford@mayerbrown.com

*Counsel for Plaintiffs*

Timothy S. Bishop (*pro hac vice pending*)
Brett E. Legner (*pro hac vice pending*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Email: tbishop@mayerbrown.com
Email: blegner@mayerbrown.com

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on February 6, 2023, counsel for Plaintiffs conferred with opposing counsel via a telephone conference concerning the relief sought in this Motion, and was advised on the telephone conference by opposing counsel that Defendants oppose this Motion.

*/s/ James B. Danford, Jr.* _____
James B. Danford, Jr.

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that, in accordance with Court Procedure 15, Plaintiffs believe that ruling on this motion prior to March 20, 2023, the effective date of the Rule they request the Court to enjoin, is an emergency and that the undersigned notified the case manager in advance of this filing.

*/s/ James B. Danford, Jr.*
James B. Danford, Jr.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 7, 2023, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ James B. Danford, Jr.*
James B. Danford, Jr.